14709

HICKS v. ATLANTIC COAST LINE R. CO. *ET AL*

(197 S. E., 819)

*Messrs. McEachin & Townsend,* for appellant,

*Messrs. Willcox, Hardee & Wallace* and *Woods & Woods,* for respondents,

June 29, 1938.

The opinion of the Court was delivered by MR. A. L. GASTON. Acting Associate Justice.

This action was commenced on February 6, 1937, upon a cause of action for damages for the wrongful death of

J. B. Hicks at a crossing of defendant Company's track and the ice plant road in the outskirts of Hartsville. The complaint alleges that no statutory crossing signals and no warning of any sort were given, and no effort was made to stop after discovery of plaintiff's intestate on the track. The defendants answered, denying the material allegations of the complaint and alleging gross contributory negligence on the part of the plaintiff's intestate.

The case was tried before Judge Mann and a jury at the February (1938) term of the Court of Common Pleas for Florence County and resulted in an order of nonsuit on the ground that the plaintiff's intestate was guilty of such gross contributory negligence in walking into the side of the defendant's train as to preclude recovery of damages for his death.

The appeal is taken from the order of nonsuit and judgment thereon.

The complaint alleges in Paragraph 4, "That on December 7, 1936, at or about 9:10 A. M., the plaintiff's intestate started from the ice plant near Hartsville, S. C., toward the ·railroad crossing with the road from the ice plant; that, as the plaintiff's intestate stepped upon the crossing of the ice plant road with the Atlantic Coast Line track, suddenly and without warning or signal of any sort, the Atlantic Coast Line train, while running at a high, dangerous and reckless rate of speed, headed toward the Y-switch and under the control and in charge of the defendant, Marshall Stubbs, as engineer, who was not keeping a proper lookout, struck down plaintiff's intestate, inflicting such serious injuries upon him as to result in his death in a Hartsville hospital about two hours later."

"That the death of plaintiff's intestate was the direct and proximate result of the combined and concurrent negligence, and wilfulness * * * of the defendants acting together and combining to that end," in the particulars set forth.

304

The answer alleges as an affirmative defense that, "A train of the defendant Company, the locomotive of which was being operated by the defendant, Marshall Stubbs, as engineer, was traveling along one of the tracks of the defendant company, in the Town of Hartsville, at a moderate rate of speed, and that although all reasonable signals were being given, and although there was absolutely no obstruction of his view, J. B. Hicks, plaintiff's intestate, walked deliberately upon the track on which the said train was traveling and while it was in such close proximity to him that it was impossible to stop the said train after it was realized that the said J. B. Hicks, was going in front of it and before the train reached him, and that as a result the said J. B. Hicks was struck and injured by the said train as a result of which injury he died. Defendants allege that in so placing himself upon a railroad track immediately in front of an approaching train, the said J. B. Hicks did not take the slightest precaution for his safety, but on the contrary acted in a careless and willful, grossly negligent and grossly willful manner, and that such conduct of the said J. B. Hicks contributed as a proximate cause thereof to his injury and death, and that without such conduct on his part he would not have been injured and the defendants plead the contributory negligence, the contributory gross negligence, and the contributory willfulness and recklessness of the said J. B. Hicks in bar of this action."

Plaintiff's testimony developed the facts as to the injury and death of J. B. Hicks. At the time of this accident he and his wife were living in Hartsville on Miller Avenue, and had been living there thirteen years. They had five grown children. Mr. Hicks was employed at the ice plant in Hartsville and had been for over a year prior to his death. The evidence does not show exactly the amount of his salary, but he brought home $13.00 every Saturday night for his work as millright and blacksmith. On the day of the accident he was to come back home and bring tools to fix a pump.

The deceased, who would have been fifty-seven years of age in September after the accident, went to and from his work daily using the crossing where he was injured. A blue print of the place was put in evidence. The plat does not indicate the points of the compass, unless the arrow directed to the bottom of the plat is intended to designate that part as north, contrary to the usual rule that the north is toward the top of any plat. However this question is not essential now, but explains any difficulty in referring now to such directions on the plat. The dirt road leads from the ice plant, at an angle towards and across the tracks of the A. C. L. Railroad Company and of the S. A. L. Railway Company. Both railroad companies maintain a Y-track opposite and beyond the ice plant. At the crossing of the dirt road and the A. C. L. Y-tracks there is solid boarding as shown by the blue print. The deceased was hit at this crossing. He was walking and came along this dirt road from the ice plant, with the defendant company's track to his left, in a diagonal direction to the point where the crossing is located. The engine and passenger train of the defendant company were approaching the crossing coming along its track, from the direction of the ice plant, so that the engineer sitting on his right-hand side of the engine would have full view of the ice plant, the dirt road, the crossing and the pedestrian as he walked toward the track, and towards the approaching train. The approaching train would be behind the deceased on his left-hand side, until they met at the crossing. He could see the train by turning his head one-third or more of the way around before it hit him, or before he stepped on the track. He did not look. Let the only eyewitness to testify speak here, on cross examination:

"Q. How far was the engine from Mr. Hicks when Mr. Hicks stepped on the railroad? A. It was right at him. That hot box on the side more than apt hit him and slung him under the driving shaft. It hit him on the left side and slung him under the front drive shaft.

"Q. Was that when Mr. Hicks stepped on the railroad, the engine was right on him? A. Yes, sir.

"Q. Until he did take that step, he was not in front of the train? A. He was in front of it, but he could not saw it. If he had saw it, he would have got out of the way of it.

"Q. He didn't saw it because he didn't look? It was right there for him if he had looked? A. He would have had to turn around, and it would have hit him in the front.

"Q. Before Mr. Hicks stepped on the track, immediately before he stepped on the track and in the place of danger, how far was the engine from him then? A. I would say then about six yards. Time he stepped the engine hit him.

"Q. Time he stepped on the track? A. Yes, sir.

"Q. As Mr. Hicks stepped on the track the engine was right there? A. Yes, sir."

His life blood was spilled on the ties and on the outside of the track for a distance of seventy-three feet; mute evidence of the inexplicable mystery of human lack of foresight, and the certainty of danger, and often death, under the wheels of a moving train at a road crossing.

Let the thirty-four-year-old son of the plaintiff's intestate speak here as a witness:

"Q. Were there any signs on this crossing to indicate where your father was struck? A. There were signs right in the crossing, about eight or ten feet from the end of the crossing boards there where it knocked his feet down and dug into the dirt, and the only sign then was on out past the switch. It was just beyond this point here where they pulled him out from under the train and on the cross ties was blood.

"Q. Did you measure the distance from the signs here to the place where the blood was, where he was picked up? A. Yes, sir.

"Q. Do you recall that? A. Yes, sir; seventy-three feet.

"Q. Have you traveled that road that goes to the Ice Plant frequently yourself? A. Yes, sir; I have traveled it.

"Q. Is it a much used crossing? A. Yes, sir; it is used quite a bit."

The exceptions are grouped under three questions by appellant's attorneys, in their written argument.

The first issue made by the appeal is that the evidence of willful, wanton and reckless conduct on the part of the defendants was sufficient to carry the case to the jury. The plaintiff's evidence as to negligence or willfulness on the part of the defendants must be taken most strongly in favor of the plaintiff on the motion for a nonsuit. By plaintiff's evidence it appears that the defendants' train was a regular passenger train, with engine and coaches carrying at least two passengers. One of the passengers was a lady travelling from Darlington to Hartsville and testified at the trial. The train was due in Hartsville at about nine A. M., o'clock. The train was moving forward with engine in front on its own track, which runs near the ice plant, and around twenty feet of it. From this point to the crossing is a distance of about four hundred and fifty feet.

"The track on which the train was approaching came from behind the ice plant and ran nearly parallel with the ice plant road for about four hundred fifty feet; that the defendant's train gave no signals of any sort as it approached the crossing; that the train slackened speed and the engine was running smooth and without exhaust as it came up behind the plaintiff's intestate who would have had to turn almost completely around in order to see the approaching train; that there was nothing whatever to cause him to turn around; that the engineer of the train had the plaintiff's intestate in plain view for four hundred fifty feet and could not have failed to see that the plaintiff's intestate was completely unaware of the approaching train."

So that the train and the deceased were going towards the crossing in the same direction. The dirt road is not absolutely parallel with the track, but this is not material, and they cross at an acute angle and not at a right angle. Therefore,

the train moved a distance of four hundred and fifty feet, after it went by the ice plant and the engineer could plainly see the deceased as he was walking on the dirt road with his back to the oncoming train. The pedestrian on the dirt road was a man apparently in the full possession of his mental and physical faculties, walking along the usual route, evidently intending to cross the track. "As there was nothing to indicate that the deceased was not in possession of his faculties, the engineer had the right to assume that he would exercise them, and not enter the track in front of the approaching train", under the well-settled law of this State. However, the engineer is bound to exercise due care, and not only to keep a reasonble lookout, but to give timely warning to a person who is seen to be in danger. So that ordinarily a jury issue arises as to the alleged negligence or willfulness of the defendants under such circumstances.

"Therefore, from the evidence, which must be interpreted most favorably to the plaintiff, it appears that the defendants failed in the instant case to give the statutory signals; that such failure is negligence *per se,* and, presumptively, the proximate cause of death, and furnishes the basis of an inference of wilfulness, wantonness, and recklessness sufficient to carry the case to the jury. *Mishoe v. Atlantic Coast Line R. Co.,* S. C., 197 S. E., 97; *Ford v. Atlantic Coast Line R. Co.,* 169 S. C., 41, 168 S. E., 143."

His Honor Judge Mann clearly and correctly so held, and did not nonsuit the plaintiff on this issue. So that the exceptions on this point are not well taken. But even if well taken cannot prevail, if the deceased was guilty of willfulness on his part, which contributed as a proximate cause to produce his death. The second and pivotal point made by the exceptions is that under the testimony the Circuit Court, on the trial of the case, could not say, as a matter of law, that plaintiff's intestate was guilty of such gross contributory negligence as to defeat her right of recovery, but that this was a question for the jury.

It is undisputed that the deceased, J. B. Hicks, was familiar with this location and crossing; and that there were no obstructions, or other things to obscure the view. It was daylight and the visibility was not camouflaged, concealed or diminished by anything whatsoever. The only reason under the testimony that he did not look and see the train was because he would have to turn clear around in order to do so. The appellant's attorneys have expressed this in their argument as follows:

"Merely turning his head would not have helped Mr. Hicks to see the Atlantic Coast Line train as it came up behind him. Mr. Hicks would have had to turn almost entirely around to see—the plat shows this, as does the testimony—and the Atlantic Coast Line train at the time was running so smoothly as to give no warning. The evidence is to be taken most favorably to the appellant on motion for nonsuit, and the testimony for the appellant is that Mr. Hicks would have had to turn almost entirely around to see the train and that he walked with his back to the train the whole distance of approximately four hundred fifty feet to the crossing. It was testified many times that Mr. Hicks would have had to turn 'clean' around to see the engine, although the respondent tries to make it appear that if Mr. Hicks had turned 'clean' around, he would have had in view only the ice plant and could not possibly have glimpsed the respondent's track and train. The plat shows how close together the track and the ice plant and road are and it is obvious that the range of a single glance at a distance of four hundred fifty feet is vast. The evidence shows no physical disability of Mr. Hicks, and counsel for respondents cannot impute to him rigid eyes and neck."

It is undisputed that the train was in view for four hundred and fifty feet before it reached the crossing had the deceased turned around to see it. "It necessarily follows that, if the deceased had looked, before going upon the crossing, he would have seen the train in time to prevent the

collision. The deceased did not observe the slightest care for his own safety, and the failure to observe such a slight precaution as to look in both directions for approaching trains before entering the crossing was gross negligence, and wilfulness. The evidence warrants no other inference than that his failure to look was a proximate contributing cause to the collision, if not the sole cause thereof."

"The law imposes upon every capable person the █ █ duty of observing due care for his own safety when about to cross a railroad track, which necessarily involves the exercise of his senses. And while it is ordinarily a question of fact for the jury to say whether, under the circumstances of the particular case, the traveler [or pedestrian] did exercise such care, when the facts are undisputed and susceptible of only one inference, it becomes a question of law for the Court." *Cable Piano Co. v. So. Ry.*, 94 S. C., 143, 77 S. E., 868, 869.

Appellant does contend that the deceased did not hear the train because of the noise made by a shifting train on the S. A. L. track some thirteen hundred feet or less away, which would, and did, reasonably attract plaintiff's intestate's attention; and that there were such noises and confusion as to cause the deceased to keep his eyes on the tracks in front of him. The testimony has been most carefully considered along this line. The S. A. L. train was in sight, but it was on a track farther away from J. B. Hicks than was the track upon which the defendants' train approached. He had to cross defendants' track first and necessarily saw the A. C. L. track, at the crossing, before he entered upon the track, and did not heed the warning signal of a railroad crossing in his pathway, nor look for a train on it, "where it is always train time." *Robinson v. Atlantic Coast Line R. Co.*, 179 S. C., 493, 184 S. E., 96.

"The fact is that the only conclusion to be drawn █ from the evidence is that the deceased failed to exercise the least care for his own safety, but negligent-

ly and recklessly went upon the track, in the face of easily discovered danger, and thereby lost his life. A nonsuit was, therefore, proper on the ground of [the] gross contributory negligence and recklessness [of the deceased], which precluded recovery by the plaintiff." *Bogan v. Southern R. Co.,* 179 S. C., 394, 184 S. E., 143, 144.

The second ground of appeal cannot be sustained. Nor does a consideration of the third ground alter the conclusion reached, because it must be concluded in any view of the testimony that the deceased failed to exercise slight care, which in law is willfulness. He and the train met at the point where they collided and appeared to run into each other, even if he did not step into the side of the train, and although the train was not making a rumbling noise. There was nothing to prevent him from seeing the train, less than six yards away, before he took his last fatal step.

All exceptions are overruled and judgment is sustained.

Mr. Chief Justice Stabler and Messrs. Justices Bonham, Baker and Fishburne concur.

Mr. Justice Carter did not participate on account of illness.