16132

ARNOLD v. CHARLESTON & WESTERN CAROLINA R. CO.
(49 S. E. (2d) 725)

*Messrs. Babb & Babb, and Blackwell, Sullivan and Wilson,* of Laurens, *and Mr. A. C. Todd,* of Greenwood, *for Appellant,*

*Messrs. O. L. Long,* of Laurens, *and Carlisle, Brown & Carlisle,* of Spartanburg, *for Respondent,*

*Messrs. Babb & Babb, and Blackwell, Sullivan & Wilson,* of Laurens, *and Mr. A. C. Todd,* of Greenwood, *for Appellant, in reply.*

September 28, 1948.

TAYLOR, Justice.

This action was brought by one J. Ralph Arnold as Ancillary Administrator of the estate of Hayne D. McKinney, deceased, against the Charleston & Western Carolina Railway Company for damages alleged to have been sustained by reason of the death of Hayne D. McKinney, which arose out of a collision of a motor truck driven by plaintiff's intestate and one of defendant's trains at a crossing in Laurens County, South Carolina.

The defendant-appellant made timely motions for a nonsuit and directed verdict, both of which were refused. The Jury found for the plaintiff in the sum of fifteen thousand dollars ($15,000.00), and the defendant now appeals to this Court upon exceptions which raise, along with others, the question of whether or not the Trial Court erred in refusing appellant's motion for a directed verdict, which of course, necessitates a review of the evidence adduced.

The respondents offered four witnesses, Mrs. Anna McKinney, widow of the deceased driver of the truck, Mr. J. O.

Denny, a state constable, Mr. J. Ralph Arnold, who brings this action as Ancillary Administrator, and Mrs. Estelle Hendricks, none of whom witnessed the collision. A close study of the testimony shows that Mrs. Hendricks testified that she resided approximately five or six hundred (500 or 600) yards from the scene and on the afternoon of March 30, 1946, was in the yard washing her car, that it had been raining but at that time the weather was clear. Upon hearing an unusual noise in the direction of the crossing, she turned around and perceived quite a long doubleheader freight train coming down the track in her direction from Laurens towards Greenwood, "it was traveling pretty swift and was pushing a truck in front of it," that at the time of the collision she was facing in the opposite direction and did not see the actual collision. The train pushed the truck almost to her house before she first noticed the bell ringing. To the question, "Were you where you could have heard the whistle blow had it blown before the collision?", she answered, "Oh, yes, I could have heard it all right."

Mr. J. Ralph Arnold, the plaintiff in this case, testified that he is acting as such by reason of his wife being related to one of the men who were killed in the collision, that he later inspected the scene, and traveling the direction in which Mr. McKinney was traveling, one would travel an upgrade to the crossing, that you can't see the railroad tracks until you get within fifty (50) feet of them, that there is a highway sign, but had the deceased been traveling right behind another car (There is no testimony that he was.), he couldn't have seen it because it was too low, that there were railroad crossing signs there on the right, that one of the regular crossarm signs had one arm of the sign broken off and the lettering was dingy and hard to read, that the railroad track as it approaches Highway 221 from the Laurens side is in a sink with the railroad curving to the left at the highest point where it crosses Highway 221, that the tracks were obscured but he did not know whether or not the train

would be. Upon cross examination this witness testified as follows:

"Q. Were you ever there when there was a train coming from toward Laurens going south? A. No, sir.

"Q. You don't know whether one could see a train approaching from the direction of Laurens, even if they could not see the track as you claim? A. No, sir.

"Q. You don't know whether he could see a train coming up the track as high above the track as the top of the train is? A. No, sir.

"Q. You don't know whether he could see it or not? A. No, sir.

"Q. Mr. Arnold, isn't there an open field up the railroad, up to the right up there? A. I don't remember that, sir.

Q. You don't remember there being an open field there? A. No, sir.

"Mr. Long: Where?

"Mr. Babb: From the right of the Highway as you approach that railroad crossing toward Laurens."

By Mr. Babb:

"Q. Was it heavily wooded or just a hedge? A. It wasn't so heavily wooded, but I would say it was enough to obstruct the view from the railroad.

"Q. Obstruct the view of the track? A. Yes, sir.

"Q. You don't know whether it would obstruct the view of the train, because you were never there when a train came along? A. (No response.)"

Witness J. O. Denny testified that he is a state constable and resides at Cross Hill. On March 30, 1946, as he approached this crossing, he observed that Highway 221 was blocked by a freight train. Upon finding that there had been a collision between this train and a truck, he went to the front of the engine and found the truck lodged thereon, that it was down the tracks towards Greenwood, but not quite as

far as Mrs. Hendrick's house. A portion of his testimony is reproduced below:

"Q. What was the condition of the weather, and tell us what of the view you have of the track off to the right as you come in from Cross Hill, Mr. Denny? A. It had been raining but it wasn't raining at that time; as you come up from Cross Hill you are traveling over Highway No. 39, and '39' intersects or comes into Highway 221 just below this crossing, and as you come in on No. 39 into this other road No. 221, you find that is a different kind of road, the one from Cross Hill is black-top and No. 221 is cement pavement, and when you come into this road it is up from there, after you come into Highway 221, from right where you come into it to go on to this railroad crossing, why you are approaching it going up-grade, it is a pretty nice grade there and this railroad is right just about at the top of that grade.

"Q. Now this Highway No. 221 that is a U. S. Highway is it not, as well as a State Highway, that paved road, I mean? A. I think it is, Mr. Babb, I would not be positive but I think it is a U. S. Highway.

"Q. It is a U. S. Highway as well as a State Highway? A. Yes, sir.

"Q. Now, Mr. Denny, below the intersection of the Highway with the Cross Hill Road towards Greenwood, are there any 'Stop Signs' on that paved highway? A. Yes, sir; there are 'Stop Signs' there, I think the stop signs are where the road from Cross Hill comes into the Greenwood Highway.

Q. Is there a stop sign on the Cross Hill Highway? A. Yes, sir; there is a sign on that highway.

"Q. Now, towards Greenwood, were there signs or not on that road from the intersection, is there a sign for a curve there? A. I believe there is a sign indicating a curve there.

"Q. You think there is a curve sign there? A. Yes, sir; I think so.

"Q. And an intersection sign also? A. Yes, sir; and there is a crossing sign of some kind there, one of these 'V' shaped signs.

"Q. Between the intersection of the Cross Hill Road and the Greenwood Road and the railroad crossing, between those two points what signs are on the right going toward the crossing? A. I think there is a railroad sign, that yellow and black sign.

"Q. A yellow and black sign with cross marks on it? A. Yes, sir.

"Q. About how far is that sign from the railroad crossing, Mr. Denny? A. I wouldn't say the distance, Mr. Babb, but it is some little distance from the crossing you see as you approach the crossing up there on your right.

"Q. Is there ample space between that sign and the railroad tracks for a car to stop before crossing the tracks? A. I would think so.

"Q. Going at an ordinary rate of speed? A. I would think so.

"Q. Have you ever stopped between that sign and the railroad, Mr. Denny? A. I generally stop there.

"Q. You generally stop there? A. Yes, sir.

"Q. So there is room between that sign and the railroad for a man to stop his car? A. Yes, sir.

"Q. Do you know of anything other that what you just spoke of there that would interfere with the vision of a person traveling on that highway to know that there was a railroad crossing there? A. That is a matter of opinion, Mr. Babb, I don't know whether a man would notice it or not.

"Q. You don't know whether he would see it or not? A. No, sir; I don't know what he would do.

"Q. You don't think if he saw that sign back there he would notice the railroad crossing up ahead? A. That's right; he might not see the sign down there.

"Q. He might not see it? A. That's right; he might not notice it.

"Q. And he might not notice a train coming down the track as you do? A. Well, a man who is more familiar with the road and the crossings would be more careful than a man who is not familiar with it.

"Q. I am not asking you that, I asked you if he was observing the ordinary rules of driving if he could not see the trains? A. That's right; if he was on his guard.

"Q. And as he approached the crossing there is nothing to prevent his seeing that railroad sign back there and the cross-arm sign near the crossing, is there? A. No, sir.

"Q. And if he observed those signs, is there anything to keep a man from seeing an approaching train before he reached the crossing? A. I would not think so.

"Q. Not what you think, is there or not anything to keep him from seeing an approaching train, if he had observed the two warning signs before he reached the crossing? A. No, sir; not if he saw those signs."

"Mr. Babb: That is all."

The other witness presented by the plaintiff was Mrs. Anna McKinney, the widow of the deceased truck driver, who stated that her husband had been to Florida and was presumably on his way home to Minneapolis, North Carolina.

The appellant offered as evidence the testimony of a number of disinterested persons, several of whom were very near to and saw the collision. Mr. W. R. Moore, Game Warden for Laurens County, testified that on the afternoon of March 30, 1946, after visiting Hill's Fishing Camp, he was proceeding toward Cold Point Crossing, where the C. and W. C. Railway crosses S. C. Highway 221, arriving there a few minutes before 5 o'clock in the afternoon. It had been raining, but the sun had come out and the weather at that time was clear, that while approaching the intersection of Highways 39 and 221, which is approximately five hundred (500) feet before reaching the crossing, he saw the train approaching "a good piece" up the tracks and

stopped to allow it to pass, that some Negroes in a car, apparently deciding they had sufficient time to cross to the other side of the tracks, proceeded to do so to Covington's Filling Station, just across the tracks, that a few seconds later the truck with plaintiff's intestate driving "came around me like that and went by Zzz, and just went straight on to the crossing," that there was nothing to obstruct the view of the oncoming train, but the driver at no time slacked his speed. The approaching train was blowing its whistle and traveling at about the same speed as the truck. The highway signs warning of the railroad crossing were properly placed and there was nothing to obstruct the view thereof. That although there was nothing to keep plaintiff's intestate from seeing the oncoming train, he apparently did not do so until immediately before he was struck, if at all. That the truck passed him so suddenly that it frightened him.

Mrs. Josephine Teague testified that she has lived in this vicinity most of her life, that at the time in question she was sitting on the back porch of a house located one hundred nineteen (119) feet from the highway and one hundred seventy-five (175) feet from the railroad track on the Greenwood side of the crossing, that the weather was clear, and she saw the train coming, which began blowing the whistle and ringing the bell "quite a piece" up the track and continued to do so until reaching the crossing. She did not see the collision by reason of being on the opposite side of the house.

Warren Blackwell testified that he lives on Highway 39 and at the time of the collision he worked at Laurens Cotton Mill in Laurens, South Carolina, that on March 30, 1946, he, together with Wallace Fuller, Jim Burgess, Bassler Covington, and Mrs. Anna Morgan, left the Laurens Cotton Mill at approximately 4 o'clock, and after stopping in town a few minutes, proceeded along Highway 221 to Covington's Filling Station at Cold Point, where, in order

to reach his home, he turns off of 221 on a side road just a short distance before reaching the railroad crossing. Jim Burgess was let out of the car where he lived at a point before reaching Covington's Filling Station, which is on the left going from Laurens towards Greenwood, and very close to the scene of the collision. He stopped at the filling station, and while putting water in his car, heard a train blow so he got back in the car and waited for the train to block the crossing; as he intended turning to the right immediately before reaching the crossing, the train would have the effect of blocking oncoming traffic and make it safer for him to make the turn. That he had done this on other occasions. Mr. Moore, the Game Warden, had stopped facing him on the other side of the crossing headed from Greenwood towards Laurens, that he saw a car drive around Mr. Moore and proceed across the track to the filling station where he was. Later he saw the truck driven by plaintiff's intestate drive around Mr. Moore's car and proceed on to the crossing, it and the train getting there at the same time. The driver apparently saw the train only after he was upon the tracks as he tried to make an effort to miss the train by turning down the track. The whistle was blowing and the bell ringing. It had been raining, but at the time of the collision the weather was clear, and there was nothing there to obstruct the view, that the crossing is marked by highway and cross-arm signs.

Mrs. Anna Morgan, a passenger in the Blackwell car, testified in part as follows:

"A. We was waiting for the train to pass, we heard the train blowing, and Warren was waiting for the train to block the road so we could pull out."

"Q. Would you care to give us an estimate or an idea of about where the train was when you first heard the whistle, while you were sitting under the filling station? A. It was blowing a good ways up the railroad.

"Q. Did you see the train pass back of Covington's Filling Station? A. Yes, sir; I could see it.

"Q. Was the bell ringing? A. Yes, sir."

"A. I saw a truck coming up the road from towards Greenwood going toward Laurens, and this truck kept on coming and the train was still blowing and the bell was ringing but it kept coming on and just about time it got on the railroad track why the train hit him and I screamed."

A portion of the testimony of Wallace Fuller, also a passenger in the Blackwell car, appears as follows:

"Q. What was the purpose of the car stopping at the filling station? A. He told us he was stopping there to put water in the radiator and he got out and put water in the car, and when he had put the water in the car, he got back in the car and we heard the train coming, it was blowing back up the track, so we just waited there for it to go by.

"Q. Take your time, I know this is new to you. Go on. A. Well, about this time I looked down the road and seen this truck coming up the road toward the crossing and it looked to me like he was trying to beat the train to the crossing, but when he got in about three or four foot of the crossing and seen he couldn't beat it there he turned to the left like and the train struck the truck and drug it on down the track.

"Q. Where was the train when you heard the whistle blowing? A. You mean where up the track before it got to the Cold Point Crossing?

"Q. Yes. A. Well, I'd say about a hundred yards, maybe a little bit further.

"Q. And at the crossing what did you see? A. You mean when the train and the truck come up on the crossing?

"Q. Yes, at the railroad and highway crossing there. A. Well, it come like I said while ago, the truck passed in front and turned to the left just as it got there, tried to turn to the left to go down the track and the train hit it and sort of pushed it on down the track, I would say."

It is impossible to lay down any hard and fast rule by which it may be determined whether or not the question of contributory negligence is to be found, under the evidence, as a conclusion of law or be submitted to the Jury as a question of fact. The determination of such a question must necessarily be controlled by the facts and the circumstances of each particular case as shown by the evidence. If the testimony be conflicting or the conclusions reached therefrom be doubtful or uncertain, the Courts will not decide this question as one of law but it then becomes a question of fact for the Jury. If, however, it appears there was such negligence or gross contributory negligence proximately entering into and contributing to the accident, it is the duty of the Court to so find as a matter of law.

Upon approaching a railroad crossing one is required to look and listen in both directions for approaching trains, if not prevented from doing so by the fault of the railway company. "And to the extent the matter is under his control must look and listen at a place and in a manner that will make the use of his senses effective." *Chisolm v. Seaboard Air Line Railway Company,* 121 S. C. 394, 114 S. E. 500, 503; *Robison v. Atlantic Coast Line Railway Company,* 179 S. C. 493, 184 S. E. 96.

In the case of *Osteen v. Atlantic Coast Line Railway Company,* 119 S. C. 438, 112 S. E. 352, this Court held where one saw the train or by exercising the slightest degree of care could have seen and heard it, and to a person of ordinary prudence such an attempt to cross was obviously dangerous, reckless, or wanton, he is guilty of gross contributory negligence, recklessness, and wantonness as a matter of law.

"Subject to applicable qualifications 'and limitations, where a traveler about to enter upon a crossing has an opportunity, by exercising his sense of hearing or sight, to discover an approaching train in time to stop in a place of safety, it is his duty under such circumstances to look and

listen, and, if he fails to do so, or fails or neglects, as he approaches the crossing, to see or discover an approaching train dangerously near the crossing, which the evidence shows he could or must have discovered, in the exercise of ordinary care, had he looked or listened, such failure to look and listen amounts not only to negligence, but to gross negligence as a matter of law." *Robison v. Atlantic Coast Line Railway Company, supra* (179 S. C. 493, 184 S. E. 100.)

Respondents apparently rely to a great extent upon evidence presented to the effect that the railway tracks were invisible to an approaching traveler unless and until he was within approximately fifty (50) feet of such track, but at no place is there any testimony that the train itself could not be seen from a reasonable distance. On the contrary, there is an abundance of evidence as to the presence of the crossing signs and that there were no obstructions to bar a clear view of an approaching train by one approaching the crossing from the Greenwood side.

"Even though the view of the railroad track be partially obstructed at a crossing, that fact does not relieve the traveler of the obligation to look and listen for an approaching train. The very fact of the existence of such obstruction, and particularly when it is known to the traveler, imposes additional care and caution upon him when approaching the track. The right of a railroad company at a highway crossing is superior to the right of a traveler upon a highway, but this superior right does not relieve the company of reasonable and ordinary caution to prevent accidents at such crossing, and this degree of care may be affected by obstructions which prevent the track from being seen as a train approaches. Both the traveler and the company are charged with the same degree of care; the one to avoid being injured, and the other to avoid inflicting injury. The care of each must be commensurate with the risk and danger involved. The greater the risk, the greater the care. *Chisolm v. Seaboard Air Line Ry. Co.,*

*supra; Edwards v. Southern Railway,* 63 S. C. 271, 288, 41 S. E. 458; *Johnson v. Seaboard Air Line Ry. Co.,* 163 N. C. 431, 79 S. E. 690, Ann. Cas. 1915B, 598; *Southern Railway Co. v. Hansbrough's Adm'x,* 107 Va. 733, 60 S. E. 58." *Robison v. Atlantic Coast Line R. Co., supra.*

"The circumstances may be such that existence of negligence or gross contributory negligence becomes a matter for the determination of the Court and not for the jury, as where the existence of contributory negligence is the only conclusion deducible by reasonable minds." *Carter v. Atlantic Coast Line Railway Company,* 194 S. C. 494, 10 S. E. (2d) 17, 20; *Smith v. Southern Railway Company,* 207 S. C. 179, 35 S. E. (2d) 225.

A traveler crossing railroad tracks is not bound to see or hear the approaching train, but is bound to make all reasonable effort, to see and hear, that an ordinarily prudent man would make under like circumstances. See *Wright v. Southern Ry. Co.,* 210 S. C. 432, 43 S. E. (2d) 139; *Timmons v. Southern R. Co.,* 138 S. C. 82, 136 S. E. 27; *Weaver v. Southern Ry. Co.,* 76 S. C. 49, 56 S. E. 657, 121 Am. St. Rep. 934; see also *Samkiwicz v. Atlantic City R. Co.,* 82 N. J. L. 478, 81 A. 833, Ann. Cas. 1913C, 1366; 13 A. L. R. 946; *Harbert v. Atlanta, etc., R. Co.,* 78 S. C. 537, 59 S. E. 644; *Baxley v. Atlantic Coast Line Ry.,* 193 S. C. 429, 8 S. E. (2d) 744.

The testimony heretofore referred to shows that plaintiff's intestate was returning from Florida to his home in North Carolina, that while traveling between Greenwood, South Carolina, and Laurens, South Carolina, along Highway 221, he approached the junction of Highway 39 shortly before reaching this crossing, that this junction was properly marked with highway signs and between these signs and the crossing were other signs denoting the presence of a railway crossing. That had these signs been heeded by plaintiff's intestate, he would have been bound to see the oncoming train.

Mr. Moore, one of the eye witnesses, saw the train and stopped to let it pass. Another car with some Negroes therein, seeing that they had time to cross before the train reached the crossing, proceeded slowly around his car and crossed over to Covington's Filling Station. It is undisputed that there was nothing to obstruct the view of the approaching train and that the emergency brakes were applied immediately after the collision, the train stopping in less than its length, and that any stop within the length of a train is a good stop. It is also undisputed that plaintiff's intestate, for some unknown reason, approached this crossing with undiminished speed, drove around the Moore car straight upon the tracks immediately in front of the oncoming train.

Considering the evidence most favorable to the plaintiff, as the Court is required to do in considering a motion for a directed verdict, the conclusion is inescapable that intestate was guilty of gross contributory negligence. Plaintiff's testimony alone shows that there was a clear and unobstructed view of the tracks for a considerable distance from the crossing. There is only one reasonable inference to be drawn from the testimony, and that is that plaintiff's intestate approached the crossing within a clear view of the approaching train, unmindful of the warning signs, failed to look or listen before going upon the crossing, and in doing so is guilty of gross contributory negligence as a matter of law. *Hicks v. Atlantic Coast Line Railway Co.*, 187 S. C. 301, 197 S. E. 819; *Robison v. Atlantic Coast Line Railway Co.*, 179 S. C. 493, 184 S. E. 96; *Bogan v. Southern Railway Co.*, 179 S. C. 394, 184 S. E. 143; *Howell v. Southern R. Co.*, 192 S. C. 152, 5 S. E. (2d) 860; *Lawter v. War Emergency Co-operative Association*, S. C., 49 S. E. (2d) 227.

Judgment reversed and remanded for entry of judgment in favor of the appellant.

BAKER, C.J., and FISHBURNE, STUKES and OXNER, JJ., concur.

STUKES, Justice.

I concur because I do not think the evidence made a jury issue with respect to the giving of the statutory crossing signals. See 8355, Code of 1942. Granting that they were given in at least substantial compliance with the statute and that there was no evidence of other willfulness, wantonness or recklessness of appellant, which I think is the only reasonable inference from the testimony, it is not necessary to hold that the evidence shows conclusively that respondent's intestate was guilty of gross or willful negligence. Code Sec. 8377. It does so show that he was guilty of simple negligence which at least contributed to the accident; in other words, I think that the only reasonable inference arising from the evidence is that decedent was guilty of contributory negligence (if appellant was negligent in any particular alleged) which required direction of verdict for appellant, and for that reason I concur in reversal.