16101

BISHOP v. ATLANTIC COAST LINE R. CO. *ET AL.*
(48 S. E. (2d) 620)

128

*Messrs. Kearse & Ness,* of Bamberg, and *Blatt & Fales,*
of Barnwell, for Appellant,

*Messrs. Bert D. Carter,* of Bamberg, and *Douglas Mc-Kay,* of Columbia, for Respondents,

July 8, 1948.

OXNER, J.: This action was brought to recover damages for the alleged wrongful death of B. D. Bishop who died almost instantly as a result of injuries received in a collision between a 1939 model Chevrolet truck driven by him and a backing locomotive, which occurred about 2:45 p. m. on November 29, 1946, at a crossing within the corporate limits of the town of Denmark where the main line and a spur track of the Atlantic Coast Line Railway are intersected by State Highway No. 78.

It is alleged in the complaint that the death of plaintiff's intestate was caused by the negligence, recklessness and wilfulness of the Railroad Company and the engineer and fireman in charge of the locomotive, all of whom were joined as parties defendant, in failing to keep a proper lookout, in not providing adequate mechanical signals at the crossing,

in failing to flag the crossing or otherwise warn travelers of the approach of the backing locomotive, in operating the locomotive without adequate brakes and at an excessive rate of speed, in failing to give the statutory crossing signals, and in erecting or permitting to be erected and maintained on the right of way poles, signal boxes and other objects which obstructed the view of travelers approaching the crossing. These allegations were denied by the defendants, who also interposed a defense of gross contributory negligence and willfulness. At the conclusion of all the testimony, the Court below granted a motion by defendants for a directed verdict upon the ground that the only reasonable inference to be drawn from the evidence was that the plaintiff's intestate was guilty of gross contributory negligence as a matter of law. The correctness of this ruling is the sole issue presented by this appeal.

State Highway No. 78 is the main thoroughfare between Charleston and Augusta. The paved portion is 20 feet wide and the shoulders are surface treated. It passes through and connects the towns of Bamberg and Denmark, the two largest towns in Bamberg County. As this highway passes over the crossing in question, it runs east and west and intersects the main line and spur track of the Railroad Company, which at this point run in a northeasterly and southwesterly direction, at approximately a 45 degree angle. The spur track, which is a few feet west of and about three inches lower than the main track, runs parallel with the main track across the highway, but a short distance south of the crossing it gradually curves away from the main line to the west until at a distance of about four or five hundred feet from the crossing it runs approximately west and parallel to the highway. Here it diverges, one branch going to a coal chute and the other connecting with the Southern Railway, which is about five hundred feet south of the crossing and runs in approximately the same direction as the highway. The spur track is substantially on the same level with the

main line except for a small dip of nine inches about half-way between the crossing and coal chute. The testimony of the defendants was to the effect that this spur track was used practically every day for the purpose of "spotting cars."

On the afternoon in question, the deceased had loaded the truck with wood at Bamberg and was proceeding along State Highway No. 78 in an easterly direction for the purpose of delivering the wood to his sister at Denmark. The locomotive involved in the collision had been used to place some cars and was being backed along the spur track with no cars attached in a northeasterly direction toward the crossing, which placed it to the left of the highway in the direction in which the deceased was driving.

In approaching the town of Denmark from the east, there is a curve in the road about three-quarters of a mile from the crossing, after which the highway is approximately straight. The last house on the left is 2,150 feet from the crossing. The only other major obstruction to a view to the left of the highway is a hedge approximately 800 feet east of the crossing. Near the crossing to the left are a power pole, a telephone pole, signal supply pole and a signal control box. The signal control box is about seven feet east of the main track and at its highest point is approximately seven feet. The evidence is undisputed that when not less than five or six hundred feet from the crossing, a traveler approaching from the east can see to the left down both the main track and the spur track for a distance of at least three or four hundred feet and, therefore, would have a full view within this distance of a locomotive or train as it approached the crossing from the southwest. The poles and signal box mentioned constituted only minor momentary obstructions to the view. There is also nothing to obstruct a full view to the right as the crossing is approached from the east. The crossing is approached on a slight upgrade (the ascent is only six feet over a distance of six hundred

feet from the crossing), but there is no testimony showing that this would affect the view of an approaching train.

It appears that at a distance of 58 feet from the center of the highway there is on each side of the crossing an insulated joint in the rails of the spur track and when the wheels of an approaching train reach this point, the stop sign at the crossing turns around and the lights commence blinking. These signal lights are about ten feet from the center of the track. On the main track the "flash" point is a half a mile from the center of the highway. This difference in the location of the flash points is no doubt due to the fact that the spur track is only used for shifting purposes and the trains are operated very slowly on it. These signals were installed at the request and under the supervision of the State Highway Department and were paid for by it as a part of its safety campaign. They are maintained, however, by the Railroad Company.

On the day of the accident the weather was clear. The deceased was approximately thirty years of age and with him was a friend thirty-five years old. Both lived in the same section of Bamberg County and had driven along this highway on numerous occasions. This companion was the only eye-witness offered by appellant. He testified that the truck was in good mechanical condition; that in approaching Denmark they were traveling at the rate of 30 or 35 miles an hour; that at a distance of three or four hundred feet from the crossing, both he and the deceased looked to the left, just about the time they were passing another vehicle going in the opposite direction, but did not see any train; that they then commenced reducing their speed and looked to the right but saw no train; and that they did not see the locomotive until about the time they reached the crossing when the deceased exclaimed "Oh, my God, the train is going to hit us", and it then looked to him like the locomotive was "falling right upon us." He said as they reached the crossing the truck was not traveling

over ten or fifteen miles an hour. It is apparently undisputed that the train was not moving over four or five miles an hour. This witness admitted that after looking to the left when three or four hundred feet from the crossing, they never looked to the left again. He testified that although he had frequently passed over this crossing he had never previously observed the spur track. It appears that this witness had lost the sight of his left eye. He said he didn't hear the bell ring or the whistle blow as they approached the crossing.

The conductor and flagman were not on the locomotive at the time of the accident. The brakeman was riding on the right front of the engine and did not see the collision. The fireman testified that as they approached the crossing at a speed of four or five miles an hour, he was looking back and had a clear view of the highway east of the crossing; that he first noticed the truck when it was three or four hundred feet from the crossing and at the same time saw an automobile following it; that when the locomotive was about thirty feet from the crossing, it appeared to him that the locomotive would clear the crossing before the truck reached that point and he then told the engineer the crossing was clear; that when the tender reached the highway, the truck driver had not reduced his speed and "looked like he was dazed", whereupon he told the engineer to stop the train which he did within a distance of about five feet; and that the truck while going at a rate of forty or fifty miles an hour ran into the left corner of the tender with such force that the rear wheels of the tender were knocked off the track. The engineer testified that in approaching the crossing, he looked and saw no vehicle coming from the west; that when about thirty or forty feet from the crossing, his side was clear, the fireman told him the other side was clear and he proceeded; that about the time the tender reached the highway, the fireman called to him to stop and he immediately applied his brakes, stopped with-

in four or five feet, and then heard the noise of the collision. According to the testimony of various members of the train crew, the usual crossing signal was blown and the bell was ringing and continued to ring until after the collision.

A physician on the staff of the Roper Hospital in Charleston testified that on the day of the accident he was driving alone from Charleston to his home in Decatur, Georgia; that he first noticed the truck after rounding a curve about three-fourths of a mile from the crossing, at which time it was about 250 yards ahead of him; that when about a third of a mile from the crossing he also noticed the locomotive and thought it was standing still; that he followed the truck at a distance of 100 to 125 yards; that both vehicles were traveling at the rate of 40 or 50 miles an hour; that when about 200 yards from the crossing he first noticed that the engine was moving; that the speed of the truck was never reduced and it appeared to him that the driver was "attempting to beat the train there"; and that he saw the truck crash into the rear of the tender. This witness said that he never heard the whistle blow and did not observe the blinker lights or hear the bell ringing until he stopped. He stated, however, that he wasn't particularly looking for any signals because he had already seen the locomotive.

Appellant contends that the back of the tender struck the left front side of the truck and respondents that the left front of the truck ran into the left rear of the tender. All of the witnesses agreed and the photographs show, however, that the left front of the truck and the left side near the front were practically demolished. Evidently the force of the impact was here. There was not a great amount of damage to the right front of the truck or to the rear portion. After the collision the rear of the tender was standing near the northern edge of the crossing with the left front of the truck wedged into the left rear of the tender. The front of the truck was off the paved portion of the

highway but the rear end was on the pavement. The truck and tender blocked the highway. The rear wheels of the tender were off the track and the left rear steps were bent under the tender. The driver was pinned in the cab sitting in a semi-erect position. As previously stated, he died almost instantly. His companion was found unconscious and removed to the hospital where he remained for about a week. All the witnesses agreed that the lights were blinking after the collision.

The Court below held that the evidence was sufficient to support a reasonable inference of negligence on the part of respondents and also that there was evidence of wilfulness in view of some testimony that the statutory signals were not given. The correctness of these conclusions is not challenged by respondents. If the statutory signals were not given, it was incumbent upon respondents to show that the deceased was guilty of contributory "gross or wilful negligence" (Section 8377 of the 1942 Code). The only question for our determination, therefore, is whether the deceased was guilty of gross contributory negligence as a matter of law. The inquiry is: Could he by the reasonable use of his senses in the performance of his duty to look and listen under the circumstances surrounding him have discovered the presence of the backing locomotive in time to avoid the accident? If so, would such omission of duty constitute under all the circumstances gross negligence as a matter of law? In approaching this crossing, the duty rested upon the deceased to use his senses of sight and hearing to the best of his ability under the existing and surrounding circumstances, to look and listen in both directions for approaching trains unless prevented from doing so by the fault of the railroad company, and to the extent the matter was under his control, to look and listen at a place and in a manner that would make the use of his senses effective. *Chisolm v. Seaboard Air Line Railway Co.,* 121 S. C. 394, 114 S. E. 500. He did not conform to due care or even

slight care if he undertook to look at a point where he knew that obstructions would prevent him from seeing an approaching train, for it would be futile for a traveler to look at a place where he knew beforehand he could not see. *Carter v. Atlantic Coast Line Railway Co.,* 192 S. C. 441, 7 S. E. (2d) 163. Of course, the duty of a traveler to look and listen in both directions for approaching trains is not an absolute one, but may be qualified by attendant circumstances; and it is ordinarily a question for the jury in the application of the standard of due care to say whether the attempt of the traveler to cross without looking and listening effectively was excusable or culpable. *Chisolm v. Seaboard Air Line Railway Co., supra.* However, where the evidence shows that the opportunity of the injured person or deceased for seeing or hearing the approaching train was such that he could not fail to have seen or heard it in time to avert the accident if he had used due care in looking and listening, he is guilty of contributory negligence as a matter of law. *Robison v. Atlantic Coast Line Railway Co. et al.,* 179 S. C. 493, 184 S. E. 96, 100. It was there stated: Subject to applicable qualifications and limitations, where a traveler about to enter upon a crossing has an opportunity, by exercising his sense of hearing or sight, to discover an approaching train in time to stop in a place of safety, it is his duty under such circumstances to look and listen, and, if he fails to do so, or fails or neglects, as he approaches the crossing, to see or discover an approaching train dangerously near the crossing, which the evidence shows he could or must have discovered, in the exercise of ordinary care, had he looked or listened, such failure to look and listen amounts not only to negligence, but to gross negligence as a matter of law."

We think the conclusion is inescapable that when within five or six hundred feet of the crossing the deceased could not have failed to see the backing train if he had used due care in keeping a proper lookout

and that his failure to discover the backing locomotive in time to avert the accident was due to his own gross negligence. We shall now briefly refer to the facts and circumstances which appellant says excused the failure of the deceased to see the backing locomotive in time to avoid the accident, or at least were sufficient to require the submission to the jury of the question of gross contributory negligence.

(1) It is said that his vision was affected by the sun. The driver following him, the physician heretofore mentioned, testified that he was not disturbed by the sun. The only testimony to the contrary was that of the deceased's companion who said on direct examination that the sun affected his vision "some"; but on cross examination stated that the sun was not "blinding but to a certain extent the sun reflected on the windshield." This testimony is entirely too vague and indefinite to support a reasonable conclusion that the sun had any material effect on the ability of the deceased to keep a proper lookout.

(2) It is suggested that the automobile which the deceased passed three or four hundred yards from the crossing and the poles and signal supply box near the crossing obstructed his vision. It certainly would not constitute the exercise of due care to look for an approaching train just as the driver was passing another motor vehicle. The other alleged obstructions referred to were entirely too small to obscure the vision except momentarily.

(3) Appellant advances the possibility that the deceased may have seen the backing train and thought it was either standing still or moving forward. A traveler might have received this impression as the physician mentioned did, when some distance from the crossing but if the deceased was watching the locomotive, he could not have failed to observe that it was moving when he came near the crossing and this fact would have become apparent in ample time to have afforded an opportunity to stop. It

is true that extra precautions are frequently required to protect the traveling public when a locomotive or train is being backed over a crossing. This would be particularly true at a crossing in a populous city or village, or where there are obstructions to the view or the train is backing at night, or where a train standing near a crossing is suddenly backed, or where the circumstances are such as to deceive or mislead a traveler and throw him off guard. The failure of the railroad company to exercise proper care under the circumstances mentioned to avoid injury at a crossing would not only constitute negligence but would have a material bearing on the question of contributory negligence of the injured person. But the record before us does not present any of these unusual circumstances.

(4) The last circumstance relied on is that as the deceased approached the crossing the lights were not blinking or flashing which amounted to a representation or assurance by the railroad company that the crossing for the time being was safe. It is said that the deceased had a right to rely to some extent at least on the automatic warning signals at the crossing. It is unnecessary for us to discuss the controversial question as to what extent a traveler may rely upon warning signals of this kind. It is sufficient to state that there is no allegation in the complaint that the automatic signals were out of order or were improperly working. The charge is that the mechanical signals as installed were inadequate. Their location was fixed by the State Highway Department and they were installed under its supervision and there is no testimony showing that the insulated joints were placed too near the crossing. It may be further added that there is no testimony that the automatic signals were not working on this occasion. The testimony of numerous witnesses that they saw the lights blinking after the collision is uncontradicted. It is true that the decedent's companion testified that when within three or four hundred feet of the crossing, "We slowed down and looked to the left and didn't see any train

at all and I looked back to the right and I didn't see any train or any light blinking and about that time Bishop (the decedent) said, "Oh, my God, the train is going to hit us' ". It doesn't clearly appear from this testimony exactly how far either the truck or the locomotive was from the crossing at the time the witness says he did not see any lights blinking. Apparently he was right on the crossing when no warning signal would have been of any aid. One of appellant's witnesses testified that from his observation when the engine was moved after the accident, the blinker lights did not begin to operate until the engine was within ten or fifteen feet of the highway. If this is true and if we further assume, as the companion of the deceased testified, that the speed of the truck had been reduced to ten or fifteen miles an hour as the crossing was approached, even then, according to appellant's testimony, there would have been time to stop the truck before the collision. The locomotive was moving only four or five miles an hour and one of appellant's witnesses testified the truck could have been stopped in less than fifteen feet when traveling at a speed of ten or fifteen miles per hour.

The testimony discloses that the maximum speed limit within the town of Denmark, as fixed by an ordinance of that municipality, was twenty miles an hour. If the truck had approached the crossing at a speed within this limit, the only reasonable conclusion to be drawn from the testimony is that the locomotive could have been seen by the exercise of only slight care in ample time to have avoided the collision.

Finally, it is contended that under any view of the testimony the question of whether any negligence or gross negligence on the part of the deceased was remote in the chain of causation and that of the railroad company was the immediate or proximate cause of his death should have been submitted to the jury. It is true that the negligence of the deceased would not bar recovery

if those in charge of the train discovered him in a position of obvious peril in time to have prevented the accident by the exercise of reasonable care and then failed to exercise such care to avoid injury to him. This humanitarian doctrine was applied in *Seay v. Southern Railway Co.,* 205 S. C. 162, 31 S. E. (2d) 133, where there was evidence showing that as plaintiff's intestate was driving a truck downgrade to a crossing, the brakes suddenly failed to work 100 yards from the crossing, whereupon the driver made a frantic effort to stop but was unable to do so, and those in charge of a backing train in the exercise of ordinary care could have discovered his perilous position in time to have avoided the accident. It has also been applied to cases where a person, due to his own negligence, is on the track in a helpless condition at a place where the railroad company is required to keep a reasonable lookout (*Leppard v. Southern Railway Co. et al.,* 174 S. C. 237, 177 S. E. 129), and where the presence of a child of tender years on the track is due to the negligence or gross negligence of his mother or custodian (*Nettles v. Southern Railway Co.,* 211 S. C. 187, 44 S. E. (2d) 321). In most, if not all, of these cases the injured person or deceased was physically or mentally unable to extricate himself from the peril. Here we have a case where the deceased was in full possession of his faculties. If we accept appellant's own testimony to the effect that before reaching the crossing the speed of the truck was reduced to 10 or 15 miles an hour, the decedent was not in a position of imminent peril until within 20 or 30 feet of the crossing. Prior to that time the railroad employees had a right to assume that he would stop at a place of safety. There is no evidence that the fireman knew of the driver's perilous situation until about the time the rear of the tender reached the crossing. He then called upon the engineer to stop and the train was stopped within four or five feet. The doctrine now sought to be invoked by appellant is not applicable to the facts of this case. We think the only inference to be drawn from this testimony is that

the deceased was guilty of concurrent and continuing negligence up to the time of the collision. *Truett v. Atlantic Coast Line Railway ·Co.,* 206 S. C. 144, 33 S. E. (2d) 396. It would seem illogical to hold that due care by respondents would have prevented the accident and yet ignore the correlative fact that due care by the decedent would also have prevented it.

We have assumed in this discussion that the allegations of the complaint are sufficient to permit a recovery on the theory just discussed. The correctness of this assumption is open to serious question. It is alleged in the complaint that the respondents failed.to keep a reasonable and careful lookout. It is not alleged that the decedent was in a position of peril which should have been discovered by respondents in time to have avoided injuring him. The allegation that respondents neglectel to keep a proper lookout tends to negative the thought that they discovered the decedent in a perilous position. See *Hemmer v. Tennessee Electric Power Co. et al.,* 24 Tenn. App. 42, 139 S. W. (2d) 698; *Cleveland Railway Co. v. Masterson,* 126 Ohio St. 42, 183 N. E. 873, 92 A. L. R. 15; 38 Am. Jur., page 960.

All exceptions are overruled and the judgment below affirmed.

Baker, C.J., and Fishburne, Stukes and Taylor, JJ., concur.