16418

ALLEN v. SOUTHERN RY. CO., *ET AL.*
(61 S. E. (2d) 660)

64

*Messrs. Henderson & Salley,* of Aiken, *for Defendant-Appellant-Respondent,*

*Messrs. Leonard A. Williamson* and *Williams & Busbee,* of Aiken, *for Plaintiff-Appellant-Respondent,*

66

*Messrs. Henderson & Salley,* of Aiken, *for Defendant-Appellant-Respondent, in Reply,*

October 23, 1950.

TAYLOR, Justice.

This action was brought to recover damages for the wrongful death of A. B. Allen, a colored farmer and minister, who died as a result of his car being struck by one of appellant's trains on March 25, 1947. Upon trial of the cause before Honorable W. H. Grimball and a jury, a verdict was rendered for plaintiff-respondent-appellant for $5,000.00. Timely motions were made for a directed verdict and for judgment *non obstante veredicto,* both of which were denied, and the defendant-appellant-respondent now appeals to this Court upon exceptions which pose the questions of whether or not the motion for a directed verdict should have been granted, and failing that whether or not it was error to refuse the motion for judgment *non obstante veredicto.* The plaintiff-respondent-appellant also appeals contending that the Trial Judge committed error when he instructed the jury to disregard the allegation of the complaint as to the condition of the railroad bed since there was no testimony to

support such allegation and that the verdict as to the engineer should be reversed. For the purpose of convenience, the plaintiff will be hereafter referred to as respondent and the Railway Company as appellant.

It is well-established law that when a motion is made by a defendant for a directed verdict in his favor, the evidence must be considered most favorable to plaintiff in determining when such motion should be granted, and if more than one inference can be reasonably drawn therefrom, it becomes the duty of the Trial Judge to submit the case to the jury. *Cox v. McGraham*, 211 S. C. 378, 45 S. E. (2d) 595.

In the case of *Wright v. Southern Railway*, 210 S. C. 432, 43 S. E. (2d) 139, 142, this Court in sustaining the granting of a nonsuit stated: "On reaching a railroad crossing and before attempting to go upon the track, a traveler must use his senses of sight and hearing to the best of his ability under the existing and surrounding circumstances; he must look and listen in both directions for approaching trains, if not prevented from so doing by the fault of the railroad company, and to the extent the matter is under his control must look and listen at a place and in a manner that will make the use of his senses effective." *Chisolm v. Seaboard Air Line Ry.*, 121 S. C. 394, 114 S. E. 500, 503.

Respondent's intestate had lived in the vicinity of the crossing, at which he met his death, for many years and therefore was familiar with it and its surroundings. As he approached this crossing, driving his car on the day in question, he was seen by a neighbor who was cutting wood near the road at a point 75 or 100 yards from the crossing. At that time he was driving at a speed of 10 or 12 miles per hour and threw up his hand in greeting as he passed. This witness was the last person to see the deceased before the collision, as the train crew testified that they did not see the car until it was struck by the engine.

There is testimony to the effect that the crossing was a much traveled country road which approached the railroad track through a pine thicket and as it neared the crossing lead through scrub or blackjack oak which was permitted to grow upon the right-of-way to a distance of from 10 to 14 feet of the rail. Some of these bushes, being as high as six feet, were closer to the tracks than the poles and were thick enough to obstruct the view of a traveler. One of appellant's witnesses admitted to the presence of such bushes between the poles and the track, and the conductor of the train recalled that there were some bushes in the vicinity, and no witness placed the bushes further than 14 feet from the nearest rail.

The weather on the day in question was very windy with heavy dust storms. The engineer and the fireman both testified that they could only see as far as the front of the engine, which was forty feet from the cab, the dust being likened unto a blanket and continuous, while others said that the dust was intermittent, being in "sheets" and "whirls".

The deceased had almost succeeded in crossing the tracks at the time of impact, and appellant maintains that this lends strength to its contention that the testimony is susceptible of one conclusion only and that is that the deceased failed to use his senses of sight and hearing to the best of his ability under existing circumstances before entering upon the crossing.

If the visibility was such that the train crew, as they contend, could see no further than the front of the engine, which was 40 feet away, it is reasonable that the jury assumed that respondent's testator was also so limited in his vision. It was necessary for him to move out from behind the blackjack growth which was only 10 to 14 feet from the nearest rail in order to be able to look up and down the track. From this point to the point of impact was therefore only a few feet.

There is testimony to the effect that the crossing was in such state of repair that it was necessary to proceed cautiously, one witness stating that it was necessary to come to a stop before crossing the tracks in order to keep from "bursting tires" and another that it was necessary to proceed cautiously to avoid "breaking springs".

Respondent's testator lived some several hours after the collision and, being conscious when first reached, inquired as to what had happened and stated he had heard neither the whistle nor bell. One witness testified that she heard the train blowing from some distance away and again after the collision. Another witness testified that he was only 75 or 100 yards from the crossing and stated that the bell was not ringing and that he heard the whistle blow only after the collision and did not hear the rumble or noise of the train. Another witness testified that he heard the train blow after the collision but not before. Another witness testified that had the train blown for the crossing she would have heard it, but that it did not blow until after the collision. The conductor of the train testified that he neither heard the bell or the whistle but that he was not in position to do so. The engineer testified that he was proceeding from Hamburg, South Carolina, to Charleston, South Carolina. and that he had set the bell ringing automatically when he left Aiken, South Carolina, but could not testify positively that it was ringing at the time of the accident. He further testified that he blew the whistle not holding the cord down, but would blow for a crossing, wait several minutes and then blow again. He further testified that he could have overrun a crossing because of his inability to see. He also stated that he was not aware that he had reached the crossing where the collision occurred until the engine struck the car. Another witness for the appellant, Mr. Brabham, testified as follows:

"Q. At the paved crossing you heard it? A. Yes, sir.

"Q. It was not at this crossing? A. No, sir.

"Q. Did you hear the crash? A. No, sir.

"Q. You heard it blow at the paved crossing? A. Yes, sir.

"Q. Did you hear it blow any more? A. After it stopped.

\* \* \*

"Q. It could have blown at this crossing? A. I don't think it was that low down."

It therefore became a question for the jury to determine whether or not the statutory signals were given as required by Section 8355, 1942 Code of Laws of South Carolina.

There is a wide variance in the testimony of the witnesses as to the speed of the train, some estimating some 12 to 15 miles per hour, while others testified that it was going "pretty fast." The train in question was approximately one-half mile long, heavily loaded with coal and it is undisputed that prior to reaching this crossing there is a slight down grade.

The testimony further shows that, by reason of the condition of the weather, the railroad company's dispatcher, Mr. C. O. Lineburger, issued from his office in Charleston, South Carolina, to trains in this area the following order: "Account high wind run carefully looking out for trees, poles and other obstructions on track."

There is nothing in the record to show that this train was carrying perishables, but on the other hand the principal cargo was coal.

If the crossing signals were not given as required by Section 8355 of the Code (and this was a question for the jury to determine), it became incumbent upon the railroad to show that respondent's testator was guilty of gross or willful negligence in order to bar recovery. *Bishop v. Atlantic Coast Line Railway Co.,* 213 S. C. 125, 48 S. E. (2d) 620.

It is contended by appellant that the only reasonable inference is that the deceased came to his death by reason of gross negligence, willfullness, and wantonness on his part. With this we cannot agree. This Court

is unable to say that testator approached the crossing without using his senses of sight and hearing to the best of his ability under the circumstances, and that he did so heedlessly and in such reckless and wanton manner as to bar recovery as a matter of law. It, in our opinion, became a question for the jury.

Appellant also contends that his motion for judgment *non obstante veredicto* should have been granted by reason of the fact that the verdict was against the appellant railroad company alone, contending that the complaint contained allegations of negligent, reckless, willful and wanton acts, which were the joint actions on the part of appellant railroad company and engineer and that such actions could only arise by and through its agent and servant the engineer, and he having been exonerated, the judgment against the company alone could not stand and cites the case of *Carter v. Atlantic Coast Line Railroad Co.,* 194 S. C. 494, 10 S. E. (2d) 17.

Paragraph VI in the complaint in the instant case appears as follows: "VI. That the crossing, at which testator received his mortal injuries, is a neighborhood road and traveled place and therefore a place where the public generally and testator had a right to cross the railway's crossing. The highway crossing at the point in question not only connects Highway No. 78, both a state and national highway, on the South of the crossing with public places, such as churches and mills on the North of said crossing; but also connects with a State Highway and County Highway on the North of the crossing as well as the Northern section of Williston, a municipality on said Charleston division; and not only is it conceded that the public generally does travel and can travel said highway and traveled place, where it crosses the railway's tracks at the point where testator was so injured; but said neighborhood road and traveled place had been used by the public for more than twenty (20) years without any dispute from any person or corporation as to the right

of the public to use said highway and neighborhood road and traveled place over said railway tracks. On account of the railway's failure to keep the crossing thereat in good repair and its failure to keep obstructions, such as wires and poles on which they are strung, and growth alongside the railroad, in good order to prevent injuries and damages to those using said crossing, and its failure to erect signs as it is required to do, warning travelers of the presence and danger of the crossing, the railway has made said crossing a dangerous one, and it had complete knowledge of the special danger of this crossing and of the care that the defendant should have exercised on the day in question and under the circumstances set forth hereinabove; but notwithstanding that knowledge the railway and the engineer breached their respective duties in the manner aforesaid and by operating a special train as they were doing, which special train was running on a special schedule known to the defendants and unknown to testator or the community, requiring a high decree of care at that time and under the circumstances in the operation of said train, and knowing that no signs of danger or warning as to the presence of said crossing and approaching train were erected or given, causing testator's death."

In the *Carter case,* the negligent, careless and willful acts of the railroad were alleged to have been committed through its agent and servant engineer only with the exception of the specifications of negligence as to maintaining the station ond the spotting of freight cars so as to obstruct the view. This Court held that this did not within itself constitute negligence but must be considered in conjunction with the manner in which the train was operated.

In the instant case, Paragraph VI, quoted above, clearly charges the appellant railway company with delicts other than those committed by the engineer. The jury, after viewing the scene, found for the respondent, and we are of the opinion that this question must be resolved against

the appellant. See *Pettis v. Standard Oil Co.,* 176 S. C. 88, 179 S. E. 894, 895, where this Court stated: "If a delict be charged against both the master and servant, or against the master and servant and other agents or servants of the master, and it is shown by the evidence that the delict could have been committed by the master through some other servant than the servant sued with the master, a verdict against the master alone may be rendered."

In view of the foregoing, respondent-appellant's exceptions to the Trial Judge's ruling, that there was no evidence to sustain the allegation of the complaint as to the condition of the railroad bed and that the verdict as to the engineer should be reversed, becomes academic.

We are of the opinion that all exceptions should be dismissed and it is so ordered.

BAKER, C. J., and FISHBURNE, J., concur.

STUKES and OXNER, JJ., concur in result.