16678

ROCK v. ATLANTIC COAST LINE R. COMPANY
(72 S. E. (2d) 900)

*Messrs. Douglas McKay,* of Columbia, and *Reynolds & Reynolds,* of Sumter, *for Appellant,*

*Messrs. Marion Moise* and *John D. Lee, Jr.,* of Sumter, *for Respondent,*

*Messrs. Douglas McKay,* of Columbia, and *Reynolds & Reynolds,* of Sumter, *for Appellant, on Re-hearing,*

*Messrs. Marion Moise* and *John D. Lee, Jr.,* of Sumter, *for Respondent, on Re-hearing,*

October 30, 1952.

FISHBURNE, Justice.

The accident which gave rise to this action occurred about seven o'clock at night on Christmas Eve, December 24, 1949, at the intersection of East Calhoun Street in the City of Sumter with a track of the defendant Railroad Company. The automobile in which plaintiff was riding as a passenger collided with a Diesel yard engine that was being backed across the street. The plaintiff suffered personal injuries, and instituted this action for damages in the sum of $3,000.00.

It is alleged in the complaint that the injuries sustained by the plaintiff were caused by the negligence, recklessness and wilfulness of the Railroad Company in failing to give

the statutory signals as required by Section 8377 of the 1942 Code, in failing to keep a proper lookout, in not providing adequate mechanical signals at the crossing, in omitting to provide sufficient lights or other signals thereon to warn the traveling public of the approach of the engine and the danger of the crossing, in failing to provide a watchman at said crossing, and in failing to stop its engine in time to permit the automobile occupied by the plaintiff to proceed across the crossing in order to avoid the collision. These allegations were denied by the defendant, who interposed a defense of gross contributory negligence and wilfulness of the driver of the automobile, which should be imputed to the plaintiff, who was also guilty of gross contributory negligence upon the theory of joint enterprise.

Upon trial, the jury rendered a verdict for the full amount prayed for in the complaint. After the verdict was published, the defendant moved for a judgment *non obstante veredicto,* or, failing in that, for a new trial upon various grounds. This motion was refused, and the appeal followed.

We first consider whether the trial court erred in refusing to direct a verdict or to order judgment *non obstante veredicto* for the appellant on the ground that the plaintiff's injury was caused not only by the contributory gross negligence of the driver of the automobile in which the plaintiff was riding, as a proximate cause, but that her injury was occasioned by her own contributory gross negligence as a proximate cause thereof.

The plaintiff, Carrie Rock, with her two sons, Harmon Rock and Abraham Rock, and her daughter-in-law, Ella Rock, left their home on the East side of the City of Sumter about 6:30 o'clock p. m. to go Christmas shopping, at which time it was dark. They were all riding in a Chevrolet automobile, the joint property of Harmon Rock and his father, Emanuel Rock, the husband of the plaintiff. Harmon Rock was driving the car; his wife, Ella Rock, was on the front seat to his right; the plaintiff, Carrie Rock, was riding on the back seat immediately behind the driver, with

her son, Abraham Rock, sitting beside her. They proceeded west on Calhoun Street, where the railroad tracks in question are located, and it is admitted that they were all familiar with the railroad crossings in that vicinity.

There are three tracks of the defendant which cross East Calhoun Street on grade; these lay ahead of the Chevrolet car on the route they were following. The first track is the main line running from Sumter to Darlington; the second is a sidetrack adjoining the main line; and 40 or 50 feet west there is a curving track which connects the tracks of the defendant with those of the Seaboard Air Line Railway. The defendant's Diesel switch engine was slowly backing in a northerly direction on this connecting line when it was struck by the automobile. This connecting track crosses East Calhoun Street diagonally.

There are a number of permanent obstructions on both sides along the course followed by the plaintiff and her family as they proceeded west on East Calhoun Street. Calhoun Street is paved 40 feet in width between curb lines; it is a state highway and is heavily traveled. On the south side of the street driving from east to west, there is a large building (Early & Daniel Company), the average distance of which from the sidewalk is 32 feet, and about 30 feet from the main line track. Between the sidetrack and the curved connecting track toward the west, there are two other buildings on the south: one about 90 feet and the other about 98 feet from the sidewalk. On the north side of the street approaching the connecting track from east to west there is first a Negro church known as Bethel; then several dwellings at various distances from the main line; the one closest to the main line being about 11 feet from the street and about 100 feet from the main line track.

On the night in question, the defendant's train crew was engaged in a shifting movement along its tracks. Just prior to the collision the engine, backing with two box cars attached to its front, first proceeded north along the main line emerging from behind the Early & Daniel Company build-

ing, and crossed East Calhoun Street. The movement proceeded a sufficient distance (about 150 or 200 feet) to clear the switch of the connecting track with the Seaboard north of the crossing. The engine, pushing the box cars ahead of it, then proceeded southward across Calhoun Street on the connecting track, and having cleared the street by about 5 or 6 feet, came to a stop. The two box cars were then uncoupled, and the engine, moving at a very slow rate of speed (estimated at about 2 miles per hour), reversed its direction and again backed north into and across East Calhoun Street, directly in front of the car in which the respondent was riding. The collision followed, with the automobile striking the engine at the rear trucks under the fireman's seat. Following the collision, the engine was brought to a stop within 5 or 6 feet. The Diesel engine was equipped with a headlight on both front and rear, each of the same intensity; and there is no contradiction in the testimony that both were lighted.

There is a sharp dispute in the evidence as to whether or not signals were given by bell and whistle or by either, and as to flagging at the crossing by members of the train crew. The driver of the automobile testified that he approached the railroad crossing at an estimated speed of from 20 to 30 miles per hour, but slackened his speed before reaching the crossing. He stated, as did the plaintiff, that they were looking, but did not see the engine until almost the instant of the collision, when Harmon Rock put on his brakes.

Jessie Nelson, a witness for the plaintiff, testified, as did other witnesses differently placed, that he was walking toward the crossing near Bethel Church, about 300 feet therefrom, and neither heard the engine bell nor the whistle blow, although he was near enough to the crossing to have heard them. Neither did he see a flagman. He also said that he saw the engine and the box cars go south across Calhoun Street and disappear in the darkness (presumably behind the Early & Daniel Company building); and that the car

occupied by the plaintiff passed him going toward the crossing while the train was hidden from his sight. That he saw the engine then back north across Calhoun Street just before the collision, when the automobile driver applied his brakes.

The witness Dosia Newberry, testified that at the time the engine crossed the street just prior to the collision, not only was the bell not rung or the whistle blown, but she saw no flagman there. That she started to walk across the crossing, and was almost upon the track when the engine came backing across the street, and that she neither heard nor saw it until it was almost upon her. She also stated, as did the switchman who testified for the defendant, that it was so dark at this crossing she could hardly see.

It is stressed by the defendant that there are two street lights on East Calhoun Street: one to the east 320 feet away from the crossing, near Bethel Church, and the other to the west 245 feet from the crossing. The inference may be drawn from the evidence, however, that these street lights afforded very little if any illumination at the crossing. It must also be borne in mind, as it relates to the alleged negligence or contributory gross negligence of the driver of the automobile and of the plaintiff, that the Diesel engine was only 5 or 6 feet to the south of East Calhoun Street when it slowly commenced its backward movement. Witnesses for the defendant said that it was so slow in its movement backward that it was merely creeping along. It may be inferred, therefore, that one approaching the tracks from the east had very little light, if any, at the crossing, except the headlight on the rear of the Diesel engine which was approaching this crossing diagonally on the curved connecting line.

Evidently this headlight must have thrown its rays far ahead and above the crossing. Then, too, the movement of the engine as it proceeded backward, was so slow that it could well have gone unnoticed by the driver of the Chevrolet automobile in which plaintiff was a passenger. This is particularly true when it is remembered that this

engine had headlights fore and aft. The driver of the car and the plaintiff both testified that they did not see this engine, and in our opinion under the circumstances here stated, the question as to their negligence or contributory willfullness, and that of the defendant, should have been passed upon by the jury.

This being a motion for a directed verdict, it will be assumed, although the testimony is in conflict, that the statutory crossing signals were not given, and that the railroad company was guilty of negligence *per se* by failing to blow the whistle or ring the bell. Also, in recognition of the familiar rule, in considering whether a motion for a directed verdict should have been granted against the plaintiff, the testimony and all reasonable inferences to be drawn therefrom, must be taken in the light most favorable to the plaintiff.

Under the specific terms of the signal statute, the common-law defense is eliminated from our consideration. The statute, Section 8377, 1942 Code, provides that if the failure to give the specified signals contributes to the injury, liability for all damages caused by the collision is imposed on the railroad company, unless, in addition to a mere want of ordinary care, the person injured, or the person having charge of his person or property, was at the time of the collision guilty of gross or willful negligence or unlawful act, and that such gross wilful negligence or unlawful act contributed to the injury. *Cook v. Atlantic Coast Line R. Co.,* 196 S. C. 230, 13 S. E. (2d) 1, 133 A. L. R. 1144. And see the many cases cited in the opinion.

It appears to us that in approaching the railroad and entering upon its tracks, the evidence permits the reasonable inference that the driver of the automobile and his mother, the plaintiff, sitting on the back seat behind him, exercised as much diligence as an ordinarily prudent person would have exercised under the circumstances, having regard for their own safety and fairly endeavoring to perform their

duty. The failure to give the statutory signals was not only negligence *per se* and a violation of a statutory duty on the part of the defendant, but this omission, and other negligence shown in the absence of a flagman at the crossing, also bears upon the conduct of the driver and the plaintiff, and must affect any estimate of the amount of care they should have observed. Ordinarily, such questions are for the jury.

It may be inferred from the evidence that the driver of the car slackened his speed as he approached the crossing; and in our opinion it was a question for the jury as to whether or not he exercised only slight care. We repeat, whether under the circumstances which confronted the driver of the Chevrolet and the plaintiff, they were guilty of gross or wilful negligence, was a question which the jury alone could determine. Upon the conclusion of all of the testimony, the jury visited the scene. We cannot say as a matter of law that the driver or the plaintiff was guilty of negligence or contributory negligence amounting to willfullness or wantonness.

We likewise think the inference may reasonably be drawn, in view of the circumstances, that if the driver of the Chevrolet saw the engine he could have reached the conclusion that the engine, with electric lights on both ends, was either standing still or moving forward, because its backward movement was almost too slow to be observable.

As was stated in *Bishop v. Atlantic Coast Line R. Co.*, 213 S. C. 125, 48 S. E. (2d) 620, 625:

"It is true that extra precautions are frequently required to protect the traveling public when a locomotive or train is being backed over a crossing. This would be particularly true at a crossing in a populous city or village, or where there are obstructions to the view or the train is backing at night, or where a train standing near a crossing is suddenly backed, or where the circumstances are such as to deceive or mislead a traveler and throw him off guard."

The same principle is announced in *Smith v. Southern Ry. Co., Carolina Div.*, 207 S. C. 179, 35 S. E. (2d) 225, 228, where it is said:

"Independently of any statutory requirement, 'it is the common-law duty of the railroad company to give such signals as may be reasonably sufficient, in view of the situation and surroundings, "to put individuals using the high-way on their guard" ' " *Chisolm v. Seaboard Air Line Ry.*, 121 S. C. 394, 114 S. E. 500, 35 A. L. R. 637.

The record shows that there were no automatic signal lights at this crossing. The only signal to an approaching traveler was the usual "Railroad Crossing" cross arm warning sign.

As bearing upon the alleged negligence of the driver of the Chevrolet and the plaintiff, we also call attention to Section 8355 of the 1942 Code, which provides that a bell of at least 30 pounds weight shall be placed on each locomotive, to be rung for at least 30 seconds before such engine, if it be standing still within less distance than 100 rods of the crossing, shall be moved.

In our opinion, the motion for a directed verdict was properly overruled.

The defendant advances as a defense, the doctrine of common enterprise. Error is assigned because the trial court erred in failing to direct a verdict or order judgment *non obstante veredicto* for the defendant on the ground that on the occasion in question the plaintiff had the authority to direct and control the actions of the driver of the car in which she was a pasenger or guest. It is argued that this being true, the negligence of the driver can be imputed to the plaintiff. This assignment has to do with common-law negligence.

We have already adverted to the fact that the Chevrolet automobile was owned by Harmon Rock, the driver, and his father, Emanuel Rock, who was not in the automobile. The record shows that this shopping trip which the plaintif

and her children were headed for was a family affair, and there is no evidence from which we may declare as a matter of law that the plaintiff either assumed to the driver the relation of master or superior, or had the control or direction of the automobile. The gross negligence, recklessness, etc., if any, of the driver, should not be imputed to the plaintiff, who, the evidence shows, was a guest or passenger. The rule is clearly stated in *Padgett v. Southern Ry. Co.,* 219 S. C. 353, 65 S. E. (2d) 297, 298, quoting from 5 Am. Jur., Automobiles, Sec. 501, page 786:

"The general principle applicable to a joint enterprise, which has the support of the greater weight of authority and the approval of this Court, is as follows: '* * *. In order to constitute a joint enterprise so that the negligence of the driver of an automobile may be imputed to an occupant of the car, it is generally held that there must be a common purpose and a community of interest in the object of the enterprise and an equal right to direct and control the conduct of each other with respect thereto. In other words, the passenger, as well as the driver, must be entitled to a voice in the control and direction of the vehicle. There must be a community in the object and purpose of the undertaking and an equal right to direct and govern the movements and conduct of each other in respect thereof. Each must have the control of the means or agencies employed to prosecute the common purpose. * * *' " See also *Funderburk v. Powell,* 181 S. C. 412, 187 S. E. 742, and *Long v. Carolina Baking Co.,* 190 S. C. 367, 3 S. E. (2d) 46.

The testimony, which we need not state in detail, might support the inference that there was a community of object and purpose on the part of the plaintiff and her traveling companions, but it falls far short of establishing as a matter of law that she had an equal right with the driver to direct and govern the movements of the automobile, or any control over it. It was merely the ordinary social and domestic relationship, when a son, who owns an automobile or is part owner thereof, takes the mem-

bers of his family on a shopping tour. But ordinarily this carries no inference that his passengers have any right to direct and govern the movements of the automobile. The lower court committed no error in submitting this issue to the jury.

Error is assigned upon the ground that the trial judge charged, in accordance with respondent's request, the doctrine of last clear chance, or as it is sometimes called, the humanitarian doctrine.

The cab of this Diesel engine was glass enclosed, and located on the rear of the engine. When the engineer started the last backward motion to the north, the rear of the engine—which was its front in this movement—being 5 or 6 feet to the south of the street, he revolved around on his swivel stool so that he could face the direction in which he was going. He testified that as he approached the street, he looked to the east and saw two headlights quite a distance down the street. He looked again, and the headlights had approached nearer, and he realized that it was an automobile. He had then reached the center line of the street.

The sum and substance of the engineer's testimony is to the effect, in our opinion, that he had no reason to believe that the automobile would fail to stop until almost the instant of collision, when he blew the cattle alarm and applied the brakes. When the brakes were applied, the engine stopped within 5 or 6 feet. The testimony of the flagman is practically to the same effect, and they both testified,—engineer and flagman—that the bell never ceased ringing during the entire movement of the engine. The only reasonable conclusion to be drawn from the engineer's testimony, when taken as a whole, and not isolated portions thereof, is that he had the crossing blocked before he had any reason to believe that the automobile was not going to stop.

We do not think that the testimony is susceptible of the inference that the engineer, the fireman, or any members of the crew could by the exercise of reasonable care, have rea-

lized the perilous situation of plaintiff at a time when a collision could have been avoided. Under the evidence, all had the right to assume that the automobile would be brought to a stop at a place of safety.

As was stated in *Melton v. Atlantic Coast Line R. Co.,* 206 S. C. 251, 27 S. E. (2d) 490, 492:

"The employees of a railroad company have the right to assume, unless the contrary appears, that a person approaching the track is in possession of his faculties, and will use his senses of sight and hearing; and that he will stop in a place of safety. A railroad company is not required to slacken the speed of its train upon seeing a person approaching the track, unless the circumstances indicate that he does not or cannot see the train. However, if it appears to the engineer that such a person is in a position of danger and does not see the train it may become the duty of the company in certain circumstances and in the exercise of due care to make all reasonable efforts to slacken speed or stop the train. *Mack v. South Bound Railroad Company,* 52 S. C. 323, 29 S. E. 905, 40 L. R. A. 679, 68 Am. St. Rep. 913; *Fletcher v. South Carolina, etc. Railroad Company,* 57 S. C. 205, 35 S. E. 513; *Gosa v. Southern Railway Company,* 67 S. C. 347, 45 S. E. 810; *Lee v. Northwestern Railroad Company,* 89 S. C. 274, 71 S. E. 840; 52 C. J. 253."

The same rule is announced in *Seay v. Southern Railway Carolina Division,* 205 S. C. 162, 31 S. E. (2d) 133.

This is not a case of one on a track in an easily observable helpless condition or one, who approaching a railroad crossing was making frantic efforts to stop, and those in charge of a train, by exercising ordinary care, could have discovered the driver's perilous position in time to have avoided the accident. The principles laid down in *Bishop v. Atlantic Coast Line R. Co.,* 213 S. C. 125, 48 S. E. (2d) 620, have a strong application here.

There is no evidence that the plaintiff or the driver of the automobile were not in full possession of their senses of

sight and hearing; no evidence from which it can reasonably be inferred that the plaintiff and the driver were in an evidently perilous position, and therefore the appellant, its agents and servants, had the right to assume that the plaintiff and the driver would use their senses of sight and hearing and stop in a place of safety. When it was apparent that the automobile was not going to stop, the engine had then practically blocked the street, at which time the emergency brakes were applied, and it was promptly stopped.

As was stated in *Bishop v. Atlantic Coast Line R. Co.,* 213 S. C. 125, 48 S. E. (2d) 620, 627:

"We have assumed in this discussion that the allegations of the complaint are sufficient to permit a recovery on the theory just discussed. The correctness of this assumption is open to serious question. It is alleged in the complaint that the respondents failed to keep a reasonable and careful lookout. It is not alleged that the decedent was in a position of peril which should have been discovered by respondents in time to have avoided injuring him. The allegation that respondents neglected to keep a proper lookout tends to negative the thought that they discovered the decedent in a perilous position. See *Hemmer v. Tennessee Electric Power Co.,* 24 Tenn. App. 42, 139 S. W. (2d) 698; *Cleveland Railway Co. v. Masterson,* 126 Ohio St. 42, 183 N. E. 873, 92 A. L. R. 15; 38 Am. Jur., page 960."

The foregoing observation is likewise applicable here. It is charged in the complaint in the current case that the defendant failed to keep a reasonable lookout, and was negligent in failing to stop its engine in time to permit the automobile operated by Harmon Rock, the driver, to proceed over the crossing without colliding with the engine. It is not alleged that the plaintiff was in a position of peril which should have been discovered by defendant in time to avoid injuring plaintiff. But irrespective of this, certainly the allegation that the defendant neglected to keep a proper lookout tends to negative the thought that the train crew discovered plaintiff in a perilous position.

In our opinion, the court committed error in charging the humanitarian doctrine. For this reason, the judgment must be reversed and a new trial granted.

The foregoing opinion, on petition for rehearing, is substituted for the former opinion, which is withdrawn.

Judgment reversed.

STUKES and OXNER, JJ., concur.

BAKER, C. J., concurs in part and dissents in part.

TAYLOR, J., dissents in part.

BAKER, Chief Justice (dissenting in part).

I regret the necessity of writing a dissenting opinion on the issue of the refusal of the trial Judge to grant appellant's motion for a direction of verdict, and failing in that, to grant its motion for judgment in its favor notwithstanding the verdict of the jury, but viewing the case as I do, feel it my duty.

For the purpose of context and to set out a little more in accuracy and detail some of the facts in this case, I find it necessary to duplicate to an extent some of the facts appearing in the prevailing opinion; and will follow in the main the prevailing opinion heretofore filed in this case, but which has now been ordered withdrawn.

There are at the location of the accident three tracks of the appellant. Approaching from the east, the first track is the main line from Sumter to Darlington, the next a side track adjoining the main line, and 30 or 40 feet west (according to plat offered in evidence by appellant) a curving track, which connects the tracks of appellant with those of Seaboard Air Line Railway, on which track appellant's engine was slowly moving northwardly when struck by the automobile.

Calhoun Street is paved, 40 feet in width between curb lines. On the south side of Calhoun Street, east of the main and side tracks, there is a building (Early & Daniel Company), the average distance of which is 32 feet from the

sidewalk. Between the side track and the Seaboard connection, there are two buildings (referred to on plat as metal covered warehouses), one about 90 feet and the other about 98 feet south of the sidewalk. From a point about 540 feet east of the connecting track, the driver of a car approaching same on Calhoun Street from the east would have an unobstructed view of the connecting track to a point 55 feet south of the street and from that point to the track the point of vision on the connecting track would increase. All of the testimony shows that the engine did not go as far as 55 feet south of Calhoun Street on the connecting track before backing northward over Calhoun Street immediately prior to the collision, so it cannot be contended that there was any obstruction to vision of the engine at any pertinent time. There were no distractions of any nature to excuse approaching drivers of automobiles of their duty to be on the lookout for approaching trains or engines.

The diesel engine of switching type was equipped with headlight on both the front and rear of the engine. There is no contradiction of the testimony that both were lighted. Prior to the collision, the engine backing with two box cars attached to the front, crossed Calhoun Street going north, and cleared the switch of the connecting track with the Seaboard a short distance north of the crossing. The engine pushing the box cars then proceeded southward across Calhoun Street on the connecting track, clearing the sidewalk only a few feet—estimated by the witness, Henry Strange, Jr., as 5 or 6 feet. Upon signals from another member of the crew, the engine, moving at a very slow rate of speed, then backed north into Calhoun Street. When the engine was covering about three-quarters of the street, the automobile struck the engine at the rear trucks about under the fireman's seat. The engine was brought to a stop within 5 or 6 feet.

The testimony of the witness for the respondent, Jessie Nelson, is very material. He was walking east on the north side of Calhoun Street approaching the crossing. He testi-

fied when he was crossing Chandler Street just east of Bethel Church, which is on the north side of Calhoun Street about 350 feet east of the crossing, he saw the train going south across Calhoun Street; that the Rock car passed him about that time, and while he was passing Bethel Church, the train came back moving north and the automobile collided with the engine on the crossing; that the collision occurred about the time he saw the rear lights on the automobile blinking, which he assumed was when brakes on the car were applied.

The speed of the Rock car is variously estimated by respondent and her witnesses as from 20 to 30 miles per hour at and immediately prior to the collision and there is no testimony to the effect that the brakes were applied to reduce the speed of the car until the moment of the collision. The driver testified that he hit the train and the brakes at the same time.

We shall first consider the question as to whether the trial Judge committed error in refusing to direct a verdict or to order judgment *non obstante veredicto* for the appellant on the ground that respondent's injury was due, caused and occasioned by the contributory negligence, recklessness and wilfulness of the driver of the automobile in which respondent was riding, as a proximate cause thereof.

While the principles which govern cases of this kind have many times been stated with clarity, the difficulty lies in applying the principles to the facts of each case, and this is particularly true in this instance. It must likewise be borne in mind that if the facts are susceptible of different conclusions in the minds of reasonably minded men, the question is one for the jury. It is also to be borne in mind that, upon appeal from a judgment for the plaintiff, this Court must view the evidence most favorably to the plaintiff, and where the question is one of gross contributory negligence upon the part of a person who has obtained a verdict, the testimony must point to such with clearness and singleness of

inference, in order to justify the Court in taking the case from the jury.

We assume for the purposes of this decision that the bell was not rung nor the whistle blown, and that the crossing was not flagged. Nevertheless, it is undisputed that the driver of the automobile approached a railroad crossing, with which he was entirely familiar, at a rate of speed of 20 to 30 miles per hour without slowing down until about the instant of impact and struck the side of a locomotive, which had just proceeded onto the crossing, with headlight burning, at a very slow rate of speed; that the vision of the approaching locomotive was unobstructed for the whole distance it moved on the movement which brought it onto the crossing; that it was observed by a disinterested pedestrian witness about 350 feet away who had no occasion to be on the alert for same; and that, before striking the locomotive, the driver passed over two railroad tracks and an intervening space of approximately 30 feet before reaching the track on which the engine was then slowly moving. While the driver claimed he looked and did not see the approaching engine, the conclusion is inescapable that if he had exercised even slight care, he could not have failed to see the engine. There were no circumstances or conditions prevailing, no evidence of hustle and hurry of traffic, no noises, smoke, or fog or anything that distracted the attention of the driver or might have excused him from observing the approaching engine.

In oral argument, some point was made of the fact that the fireman testified that some people were standing on the south side of the street near the track as the engine backed towards the crossing, that it was "kind of dark out there" and that he "just could see" them, from which it might be inferred that the headlight on the engine was insufficient or not bright enough. It is to be borne in mind that the engine had proceeded only a short distance south of the street, and that the headlight was shining down the track, that they were very near the track on the sidewalk on the

south side and probably not within the area where the light was focused, or where its beams shone on them. It is a matter of common knowledge that a headlight on an engine throws beams of light ahead and not immediately in the area of the engine. The light was nevertheless sufficient for both engineer and fireman to see these people and warn them, according to their testimony, by blasts of the whistle. The headlight was observed by the witness Nelson from a long distance down Calhoun Street. It is not alleged in the complaint that the headlight was insufficient or that it was not burning brightly. Furthermore, at the angle the switch engine was coming out into the street on the track which it was occupying at the time of the collision, one approaching the crossing from the direction in which the automobile was approaching same, paying the slightest attention and looking in the direction which he was travelling, was bound to have seen the headlight on the switch engine, and the switch engine itself, unless he was driving an automobile without headlights burning thereon. We cannot see any merit in this contention.

Under the foregoing circumstances, and the undisputed facts, we are of the opinion that the driver was guilty as a matter of law of gross contributory negligence and reckless indifference to his safety and the safety of those who were riding with him. *Robison v. Atlantic Coast Line Railroad Co.,* 179 S. C. 493, 184 S. E. 96; *Moore v. Atlantic Coast Line Railroad Co.,* 192 S. C. 406, 7 S. E. (2d) 4; *Smith v. Southern Railway Co.,* 193 S. C. 44, 7 S. E. (2d) 630; *Taylor v. Powell,* 195 S. C. 486, 12 S. E. (2d) 27; *Arnold v. Charleston & Western Carolina Railroad Co.,* 213 S. C. 413, 49 S. E. (2d) 725. Also, *Funderburk v. Powell,* 181 S. C. 412, 187 S. E. 742; *Mozingo v. Atlantic Coast Line Railroad Co.,* 220 S. C. 323, 67 S. E. (2d) 516.

We are not prepared to hold as a matter of law that the respondent was herself guilty of gross contributory negligence, but the acts of the driver are imputable to her for the reasons hereafter appearing.

As to the alleged failure to give statutory signals, of which there was testimony on the part of the respondent, the gross contributory negligence or wilfulness of the driver of the automobile is imputable to the respondent. Sec. 8377, 1942 Code of Laws of South Carolina; *Wright v. Southern Railway Co.,* 210 S. C. 432, 43 S. E. (2d) 139; *Neely, Admr. v. Carolina & N. W. Railway Co.,* 123 S. C. 449, 117 S. E. 55; *Smith v. Southern Railway Co.,* 193 S. C. 44, 7 S. E. (2d) 630. But let it be assumed that there was also testimony as to the other acts of negligence on the part of appellant. The ownership of the automobile by respondent's husband and the driver jointly appears in the prevailing opinion. Respondent testified that it was used as a family car and if she wanted to go uptown, her son, Harmon Rock, would drive her, and that on this occasion they were going to town to do Christmas shopping. Harmon Rock testified that the members of the family were going shopping, that he was driving the car, that when he was driving the car, he would go wherever they wanted him to go, and when they wanted him to stop, he would stop. Ella Rock, wife of Harmon, testified generally to the same effect, and that if respondent wanted Harmon to go a certain place, she would tell him and he would go. Under all of the circumstances, the respondent is shown to have such control, or right of control, of the operation of the automobile as renders the trip a joint enterprise and makes the acts of the driver of the automobile imputable to her. The facts as to this phase of the case were not in dispute. The trial Judge submitted the issue to the jury for determination, but we think he should have held as a matter of law that a joint enterprise was established.

Section 8377 of the Code cited above, reads as follows:

"If a person is injured in his person or property by collision with the engines or any car or cars of a railroad corporation at a crossing, and it appears that the corporation neglected to give the signals required by this chapter, and that such neglect contributed to the injury, the corporation

shall be liable for all damages caused by the collision, or to a fine recoverable by indictment, as provided in the preceding section, unless it is shown that in addition to a mere want of ordinary care the person injured, or the person having charge of his person or property, was at the time of the collision guilty of gross or wilful negligence, or was acting in violation of the law, and that such gross wilful negligence or unlawful act contributed to the injury."

The facts in the case of *Wright v. Southern Railway Co.,* *supra* [210 S. C. 432, 43 S. E. (2d) 140], are set out in the opinion, and are as follows:

"A review of the testimony shows that the plaintiff at the time of her injury was riding in an automobile driven by a Mr. Powell; that the two had originally planned to go to a tent show, but because of the cold and dampness of the night decided to return to her home; that on the way she suggested they go to an ice cream parlor first. They proceeded down Granard Street until reaching Birnie and along Birnie to the place where it crossed the tracks of the defendant railway company, there being two main line tracks (one for northbound traffic and one for southbound traffic) and a third track being used as a sidetrack. Mr. Powell, the driver of the car, testified that he was familiar with the track crossing; that the night was damp and foggy, the windows of the car were up and that they and the windshield were blurred; that as he approached the crossing, he slowed down but did not stop; that he was looking in the direction in which he was driving; that although he looked both ways and there was no obstruction to prevent his seeing the oncoming train, he neither saw nor heard it before it was within a few feet of the car. He admitted proceeding around an automobile which had stopped immediately in front of him, and that had he stopped before entering upon the right-of-way of defendant, the accident would not have happened. He testified that trains passed quite often, and he knew this to be a dangerous crossing.

"The plaintiff testified substantially to the same effect, stating that she was riding on the right side; that she heard no whistle and that the train was within 9 or 10 feet of them when she first became aware of it. She testified that she visited Gaffney frequently and knew of the crossing, and knew it was dangerous to cross there with mist blurring the windshield and windows as on this occasion. She also testified that she saw the car stopped there, and that they drove around it thinking it was backing up. She further testified that there was misty rain and fog and one could hardly see; that it was difficult to drive but they could see the lights of other cars and the street lights which were on at the time and running parallel to the tracks; that it was too cold to have the windows down, but had they been, the occupants of the car could have seen and heard much better; that the car slowed down but never stopped before entering the right-of-way of defendant.

"The view both ways along defendant's right-of-way here is admittedly clear of obstructions and nothing to prevent the plaintiff from seeing the oncoming train except the weather conditions and the fog and mist on the windows and windshield of the car."

Under the facts as above related, it is readily seen that the facts of that case are not nearly so strong on the issue of gross contributory negligence and wilfulness of the driver, and joint enterprise as are the facts of the case under discussion; and there this Court held that the trial Judge correctly nonsuited the plaintiff on the ground of the gross contributory negligence and wilfulness of the driver of the car in which plaintiff was riding, and joint enterprise.

For the reasons stated, I am of opinion that the judgment should be reversed, and the case remanded for entry of judgment in favor of defendant, and not merely for a new trial as the prevailing opinion holds.

TAYLOR, J., concurs.