15771

SMITH v. SOUTHERN RAILWAY CO., CAROLINA DIVISION

(35 S. E. (2d), 225)

*Messrs. Edgar A. Brown* of Barnwell, S. C., and *J. W. Manuel* of Hampton, S. C., Counsel for Appellant,

*Mr. Randolph Murdaugh,* of Hampton, S. C., Counsel for Respondent,

September 7, 1945.

Mr. Associate Justice Oxner delivered the unanimous Opinion of the Court.

Respondent, Orren Smith, recovered a verdict for $12,-000.00 actual damages against appellant, Southern Railway Company, on account of personal injuries received in a collision between a Chevrolet Coupe in which he was riding and a backing freight train, which occurred about 2:30 A. M., on Sunday, August 29, 1943, at a crossing in the village of Lena in Hampton County. Appellant has appealed from the judgment entered on said verdict. There are two questions to be determined: (1) Was the respondent or the driver of the automobile guilty of gross contributory negligence or willfulness as a matter of law? (2) Did the lower Court abuse its discretion in refusing to grant a new trial on the ground that the verdict was so excessive as to show caprice, passion, and prejudice on the part of the jury?

Viewing the testimony and all reasonable inferences to be drawn therefrom in the light most favorable to respondent and disregarding any controverting evidence offered by appellant, the following material facts appear:

Respondent was seventeen years old at the time of the accident, resided with his father and mother on a farm about seven miles east of Lena, and attended the rural schools in that community where he had reached the tenth grade. About 8:00 P. M. on the night of the accident, he and two companions, Bernard Long and John Wooten, who resided in the same community and were approximately the same age as respondent, drove from their homes to attend a dance at Varnville. After attending the dance, they left Varnville shortly after midnight and went to Fairfax to get something to eat. Fairfax was the nearest town which had a restaurant open at this hour. They ate sandwiches and drank Coca-Colas and started home about 1:30 A. M. by way of Estill and Lena. Long, who owned the Chevrolet Coupe, was

driving; Wooten was sitting in the middle and respondent on the right side. The road between Estill and Lena is a paved, heavily traveled highway, extending east and west, and for some distance on each side of Lena is straight and level. In driving from Estill to Lena these boys were traveling in an easterly direction. There is no contention that they were under the influence of intoxicants of any kind. In approaching the village of Lena they were traveling approximately 35 miles an hour. The car was in good mechanical condition.

This highway intersects the tracks of appellant in the village of Lena at approximately right angles. The railroad line runs north and south and is straight for more than a mile in each direction from the village. There are two parallel tracks, a main line which is first reached by one traveling in the direction respondent was going, and a side track which is eight or ten feet east of the main line. In approaching the crossing in the direction traveled by these boys, the view to the left is obstructed by a filling station, the depot and a water tank until one gets within about 15 or 20 feet of the crossing, at which point there is an unobstructed view of the tracks for a distance of more than one-half mile in each direction. All of these boys had traveled this highway at frequent intervals and were thoroughtly familiar with the crossing and its surroundings.

The night in question was dark. As respondent and his companions approached the crossing, they reduced the speed of the car when at a distance of about 50 yards from the crossing. About this time another car, going in the same direction, passed them and proceeded across the tracks. When respondent's car was about 25 or 30 feet from the crossing and about to stop, still another car, going in the opposite direction, came across the tracks and passed. After meeting this car, respondent's car was driven about five feet farther and brought to a complete stop at a point approx-

imately 20 feet from the crossing. Both the driver and respondent looked in both directions and listened for approaching trains, and seeing or hearing none, then proceeded to cross the tracks while continuing to keep a proper lookout. They passed over the main line, and when between the tracks of the main line and the siding first saw a boxcar on the end of a train backing in a southerly direction. The driver of the car could not estimate exactly how far he was from the end of the train when he first saw it, but feeling he did not have time to stop the car, swerved to the right to avoid a collision, and the automobile collided with the side of the boxcar on the rear end of the train. As a result of the collision respondent suffered certain personal injuries which will be hereinafter referred to. The record does not disclose the exact speed of the train, but there is some testimony that it was running between 10 and 15 miles per hour. The statutory crossing signals were not given. The end of the train was unlighted. There was no flagman stationed at the crossing and no notice or warning whatsoever was given of the approach of the train, which was being backed on a dark night without any lights or markers whatsoever.

Appellant offered testimony tending to show the following facts: The freight train, consisting of 31 heavily loaded cars besides the caboose, was proceeding north and arrived at Lena shortly after 2:00 A. M. The train pulled into that part of the siding which was north of the crossing and stopped at a point where the engine was standing about five car lengths from the north switch and the caboose 10 or 15 feet north of the crossing. After waiting for about one-half hour for two passenger trains to pass, the back-up signal, consisting of three short blasts of the whistle, was given and the automatic bell started ringing. The flagman and brakeman were at the crossing with electric lanterns to warn any travelers approaching the crossing. The train was backed in a southerly direction and when the rear end passed over

the crossing, the brakeman and the flagman boarded the caboose. According to appellant's contention, when the collision occurred, about eleven cars had passed over the crossing and respondent's automobile collided with the southern end of the twelfth car from the caboose, at a 45-degree angle, causing the uncoupling of the train between the eleventh and twelfth cars. None of the train crew saw the collision, but knew something had happened and stopped the train. The greater portion of the siding is on the north side of the crossing. Instead of going forward through the north switch of the siding, the train was backing so as to enter the main line through the south switch in order to allow time for the train to get sufficient momentum to pull a grade at some distance north of the crossing. According to the testimony of the train crew, all statutory signals required at crossings were given; the entire train was stationed north of the crossing; the caboose was the forward car of the train as it was being backed; the rear of the caboose was lighted with standard lights and markers which were all burning brightly, and in addition there was a red lantern hanging and burning on the rear of the caboose; in fact, the flagman testified that the rear of the train "looked like a circus." The crew estimated the total length of the train to be from 1,500 to 2,000 feet.

The foregoing review of the testimony discloses an irreconcilable conflict in the evidence. According to the testimony of the members of the train crew, the train was never broken when placed in siding; all necessary signals and warnings of the approach of the backing train were given; and respondent's car was negligently and recklessly driven into the train after eleven cars had passed over the crossing. There is abundant testimony by respondent tending to show that the train was disconnected, part of it being stationed on the siding north of the crossing and the other part on the siding south of the crossing, and that the automobile collided with a boxcar on the end of the train which was

backed, without any warning whatsoever of its approach, for the purpose of coupling the two sections. One witness for respondent testified in reply that he had measured the length of the siding north of the crossing which showed a distance of 1,400 feet from a point 15 feet north of the crossing to the north switch (the engine was five car lengths south of the north switch). According to this testimony, the length of the train, as estimated by the train crew, was such that the entire train could not have been placed north of the crossing. There is further testimony on the part of respondent to the effect, as heretofore adverted to, that two cars passed over the crossing just before respondent's car entered the crossing.

The automobile, which passed respondent's car 50 yards from the crossing while going in the same direction, was driven by the owner of the cafe at Fairfax where respondent and his companions had eaten. He was taking home two ladies who worked in the cafe that night. He testified that, althought he kept a careful lookout, he neither saw nor heard any approaching train and proceeded across the tracks without ever knowing there was any train near the crossing.

Appellant made a motion for a directed verdict upon the grounds that there was no evidence of actionable negligence on its part and that the respondent and the driver of the automobile were guilty of contributory negligence, gross negligence and willfulness as matter of law. The exceptions of appellant raise both questions, but the question of there being no evidence of negligence on the part of the appellant contributing as a proximate cause of the collision was not argued in appellant's brief, nor was it urged in oral argument. We may therefore regard that question as abandoned. However, we may add that the lower Court was clearly correct in submitting this issue to the jury. It is uniformly recognized that the operation of a train back-

wards at night over a road crossing is attendant with a great amount of danger to travelers and consequently a railroad company is bound to exercise special care, when doing so, to avoid injuring persons lawfully on or approaching the track. See Annotation in 15 A. L. R., page 1527. As stated by that eminent jurist, Judge Parker, in *Waid v. Chesapeake & O. R. Co.*, 4 Cir., 14 F. (2d), 90, 92: "When * * * there is evidence tending to show that cars were being backed in the darkness, or in the dusk of approaching darkness, without lights being displayed on the forward car, and without signals or warnings of any kind being given, it is clear that the issue of negligence should be submitted to the jury." The duty of a railroad company to warn travelers of the approach of a backing train at night has been extended under certain circumstances to places other than regular railroad crossings. *Jones v. Charleston & W. C. Ry. Co.*, 61 S. C., 556, 39 S. E., 758; *Sanders v. Southern Ry.*, 90 S. C., 331, 73 S. E., 356; *Carter v. Seabord Air Line R. Co.*, 114 S. C., 517, 104 S. E., 186. Independently of any statutory requirement, "it is the common-law duty of the railroad company to give such signals as may be reasonably sufficient, in view of the situation and surroundings, "to put individuals using the highway on their guard.'" *Chisolm v. Seaboard Air Line R. Co.*, 121 S. C., 394, 114 S. E., 500, 502.

We now approach the consideration of the principal question on appeal—was the respondent or the driver of the car guilty of contributory negligence or gross negligence as a matter of law? It seems to be assumed in argument by both parties that any negligence on the part of the driver of the automobile must be imputed to respondent. We shall also assume, without deciding, that it is not necessary for appellant to show gross negligence or willfulness on the part of respondent and that simple contributory negligence would be sufficient to defeat recovery. The inquiry then is whether

either the driver or respondent was guilty of contributory negligence as a matter of law.

"On reaching a railroad crossing and before attempting to go upon the track, a traveler must use his senses of sight and hearing to the best of his ability under the existing and surrounding circumstances; he must look and listen in both directions for approaching trains, if not prevented from so doing by the fault of the railroad company, and to the extent the matter is under his control must look and listen at a place and in a manner that will make the use of his senses effective. * * * The duty of the traveler arising under the foregoing rule is not an absolute one, but may be qualified by attendant circumstances. The view taken in this state is that it is ordinarily a question for the jury in the application of the standard of due care to say whether the attempt of the traveler to cross without looking and listening effectively was excusable or culpable; that is, whether or not it amounted to negligence or willful misconduct." *Chisolm v. Seaboard Air Line R. Co., supra.*

"Nevertheless, the circumstances may be such that the existence of negligence or gross contributory negligence becomes a matter for the determination of the Court and not for the jury, as where the existence of contributory negligence is the only conclusion deducible by reasonable minds." *Carter v. Atlantic Coast Line R. Co. et al.*, 194 S. C., 494, 10 S. E. (2d), 17, 20.

"Where the evidence clearly shows that the injured person's opportunity for seeing or hearing the approaching train at the time of the accident was such that he could not fail to have seen or heard it in time to avert the accident if he had used due care in looking or listening, his contributory negligence in this respect should not be submitted to the jury, but is a question for the court." *Robinson v. Atlantic Coast Line R. Co. et al.*, 179 S. C., 493, 184 S. E., 96, 100.

As stated in *Chisolm v. Seaboard Air Line R. Co.,* ■ *supra*: "The true form of the inquiry is: Could the traveler by the reasonable use of his senses in the performance of his duty to look and listen under the circumstances surrounding him have discovered the proximity of the approaching train in time to avoid the accident?"

Accepting as true, as must be done in passing on this ■■ question, the theory of respondent that the automobile collided with an unlighted boxcar on the forward end of a train which was being backed on a dark night without any warning of its approach, we do not think the evidence shows contributory negligence as a matter of law. According to the testimony offered by respondent, both he and the driver exercised due care in approaching the crossing. They stopped, looked and listened, and having heard or seen nothing proceeded to cross, and continued to look and listen but heard or saw nothing until they had passed over the main line and were about to reach the siding.

It is earnestly argued that despite the foregoing testimony, the physical facts clearly indicate that they undoubtedly would have seen the approaching train if they had kept a proper lookout, and that under the circumstances they must be held not to have looked at all or to have looked inattentively. Appellant's counsel state that the boxcar necessarily "had to be on the crossing or very close to the crossing when the automobile started to cross over a point 15 or 20 feet west of the main line," but we cannot say as a matter of law that respondent and driver were bound to have seen the approaching train if they had exercised due care in keeping a proper lookout. It was for the jury to determine the probable location of the backing train as respondent approached the crossing and whether the train at that time was within the range of the lights of the automobile so as to have been seen, in the exercise of ordinary care, in time to avoid the

collision. The occupants of the automobile were suddenly confronted with a peril not reasonably to have been expected. They could reasonably suppose that any approaching train at night would either have a headlight or, if backing, proper markers or other signal lights displayed so that one could discern its approach. While the failure to have such lights or otherwise give such warning of the approach of the train would not excuse respondent and driver from exercising due care for their own safety, they had a right to rely thereon to some extent in concluding they were not in danger of being struck by an approaching train.

Viewing the evidence in the light most favorable to respondent, we are not passing on a case where a traveler, with nothing to divert his attention or obstruct his vision, has driven on the track in front of an approaching train and been injured because of manifest failure to observe any precaution whatever for his own safety.

Numerous cases from other jurisdictions are referred to in briefs of counsel. These have been carefully read and considered. Those relied on by appellant present different factual situations with the possible exception of *De Potty v. City of Detroit,* 258 Mich., 657, 242 N. W., 799, which tends to sustain appellant's contention, but see the later Michigan case of *Spenclay v. Grand Trunk Western R. Co.,* 285 Mich., 421, 280 N. W., 813. We think the conclusion we have reached is fully sustained by the great weight of authority from other jurisdictions. *Morris' Adm'r v. Baltimore & O. R. Co.,* 107 W. Va., 97, 147 S. E., 547; *Hinkle v. Southern Pacific Co.,* 12 Cal. (2d), 691, 87 P. (2d), 349; *Cranston v. Baltimore & O. Ry. Co.,* 3 Cir., 109 F. (2d), 630; *Franklin v. Nowak,* 53 Ohio App., 44, 4 N. E. (2d), 232; *Pridgen v. Atlantic C. L. R. Co.,* 203 N. C., 62, 164 S. E., 325; *Compton v. Western Ry.,* 215 Ala., 576, 112 So., 148; *Waid v. Chesapeake & O. R. Co., supra.*

It is contended that the damage to the boxcar was such that the automobile was necessarily being driven at an excessive rate of speed when the collision occurred. Assuming that the damage to the boxcar warrants an inference of the automobile being driven at a rapid rate of speed, we cannnot say that such is the only reasonable inference to be drawn. We are not warranted under the circumstances in ignoring the positive testimony of the occupants of the automobile that they stopped when at a distance of 20 feet from the crossing and then proceeded at a very slow rate of speed. This testimony is further corroborated to some extent by the fact that another car passed them just before the crossing was reached.

The remaining question is whether the lower Court erred in refusing a new trial on the ground that the amount of the verdict was excessive. There is some conflict in the testimony as to the nature and extent of the injuries sustained; but viewing the testimony in the light most favorable to respondent, he appears to have sustained the following injuries: He was unconscious for fifteen hours after the accident. There were two bones broken in his left arm, "the radius and the ulna"; the "bone had shattered"; respondent was taken to the hospital at Ridgeland and a bone specialist from Savannah summoned; this specialist first "tried what is known as a closed reduction"; after remaining in the hospital for about five days, respondent was allowed to go home but continued under the supervision of his physicians; after several weeks, it was found that "he was not getting a union"; he was then removed to a hospital in Savannah where the bone specialist performed "an open reduction on him" and inserted a screw or a silver pin in the arm to hold the bones together; and after remaining in the hospital there about six days, respondent was allowed to go home. It appears there is coldness and numbness in his hand and arm due to an injury to the ulna nerve. There is some limitation in the

movements of the arm and he has "no grip in it." One of the physicians testified that his arm was permanently injured and that he will never be able to use it as he did before. In addition to the injury, to the arm, there is medical testimony to the effect that there was an injury to his foot "among the metatarsal bones"; that the respondent will have difficulty in standing on his foot for any long period at a time and will not be able to do such work as plowing on a farm; and that he will be restricted in the future to doing "light work".

The arm was in a cast for about three months and respondent was not able to use it at all for three months after the cast was removed. He went back to school. During the following year he did a little work in helping his father on the farm, but was unable to use his arm; assisted some in packing Irish potatoes on another farm; and finally, without any previous experience, secured a job as an electric welder at the Navy Yard in Charleston for which he was paid at the rate of 73 cents an hour. He continued to complain while working in Charleston. This work did not require heavy lifting. At the time of the trial he had been working at the Navy Yard for a period of three months.

The amount of the verdict in this case has given us much concern. Considering the nature and extent of the injuries sustained, it is unquestionably a very large verdict. The trial Judge refused to disturb it and after mature consideration, we do not feel warranted in holding that his refusal to grant a new trial amounted to a manifest abuse of the discretionary power vested in him. We cannot say "that the facts are susceptible of no other reasonable inference than that the verdict was so excessive as to indicate that it was the result of prejudice, caprice, or passion, or other considerations not founded on the evidence."

"Under the Constitution and statutes, the discretion to control juries in respect to the amount of their verdicts in actions for damages is vested in the trial judges, who, it must be presumed, recognize and appreciate their responsibility, and exercise the discretion vested in them with fairness and impartiality." *Steele v. Atlantic Coast Line R. Co.*, 103 S. C., 102, 87 S. E., 639, 644. "* * * if a verdict which is only moderately excessive is allowed to stand, the trial judge is alone responsible; for he alone is vested with power and discretion to set it aside, absolutely or conditionally. This court has no power to do so, unless * * * it is so excessive as to warrant the conclusion that the circuit judge abused his discretion in refusing to grant relief against it." *Huggins v. Atlantic Coast Line R. Co.*, 96 S. C., 267, 79 S. E., 406, 410.

Respondent suffered much pain. He is a young man with a long life expectancy. The jury could have reasonably inferred that he will be seriously handicapped in doing any work requiring the full use of his arm and leg and that by reason thereof his earning capacity is permanently impaired. One of the physicians, in referring to the arm injury, testified: "In all probability it will continue the balance of his life, on account of the way the bone was broken and the way it had to be set." It is true that at the time of the trial, and for several months prior thereto, respondent was earning substantial wages at the Navy Yard at Charleston, but it was for the jury to determine whether he could have secured work of this type and held the job under normal competitive conditions.

All exceptions are overruled and the judgment below affirmed.

Mr. Chief Justice Baker and Messrs. Associate Justices Fishburne, Stukes and Taylor concur.