292 P.2d 827

**SOUTHERN PACIFIC RAILROAD CO., a corporation, and Southern Pacific Company, a corporation, Appellants,**

**v.**

**Birdie MITCHELL, Appellee.**

**No. 6005.**

Supreme Court of Arizona.

Jan. 24, 1956.

Boyle, Bilby, Thompson & Shoenhair, by Harold C. Warnock and Richard B. Evans, Tucson, for appellants.

Barber, Lesher & Dees, Tucson, for appellee.

UDALL, Justice.

This action was brought by Birdie Mitchell (plaintiff-appellee), to recover damages for injuries arising as a result of a collision between an automobile, in which she was riding as a guest, and a backing train then owned and being used in switching operations by the defendant-appellant, Southern Pacific Company. The defendant-appellant, Southern Pacific Railroad Company, owns the right of way where the tracks are laid, and the Southern Pacific Company operates the trains. No question is here presented as to which one of the two corporate entities is liable, if a liability is found to exist. The parties will herein-

after be referred to as plaintiff and defendants or the latter, at times, as the railroad company.

The case was tried to the court, sitting with a jury, upon the issues made by plaintiff's second amended complaint and the defendants' answer thereto. The complaint was in two counts. The first count alleged the defendants were negligent in the operation of a train. The second count alleged the defendants were negligent in the maintenance of a railroad crossing and in failing to have proper warnings at the crossing, as a result of which the collision occurred. The answer denied negligence, alleged that the accident in which the plaintiff was injured was the sole proximate result of the negligence of the driver of the automobile in which plaintiff was a passenger, and alleged that plaintiff was contributorily negligent.

A motion for a directed verdict in favor of defendants was made at the close of the plaintiff's evidence and renewed at the close of the entire case. These motions were denied. The jury returned verdicts for damages in favor of plaintiff in the sum of $35,000. Thereafter both defendants made motions for judgment notwithstanding the verdicts, and for a new trial, which were denied. This appeal was taken from the judgment entered upon the verdicts of the jury and from the order of the court denying defendants' motions for judgment n. o. v., and for a new trial.

There are nineteen assignments of error supported by some eight propositions of law, which we shall consider in such order as seems best. As we read their contentions, the defendants are first complaining because of the trial court's refusal to direct the jury to return a verdict in their favor or to render judgment n. o. v., for the reason that there was no competent evidence from which it could properly be inferred that the defendants were negligent in any respect or that any negligence on the part of either of the defendants was a proximate cause of any injuries sustained by the plaintiff. Prejudicial error is also assigned in the denial of their motion for a new trial: (1) on the ground that the court had improperly given two of the instructions submitted by plaintiff and refused to give some fifteen instructions offered by defendants; (2) because of the misconduct of the bailiff and court reporter in a certain unauthorized contact with the jury during its deliberations, and (3) because the court permitted one of the verdicts to be amended after the jury had been discharged.

■ The evidence is not seriously in dispute but where there is a conflict we shall, in accordance with our well recognized rule, state the facts in a light most favorable to a sustaining of the judgment. Plaintiff's injuries had their origin in a collision between an automobile that was being driven west on East 17th Street, in Tucson, and a moving train operated by defendant Southern

Pacific Company, at the intersection of the railroad tracks which cross said street. The accident occurred in the early morning of May 23, 1953. Other than for darkness the visibility was clear and the weather good. The asphalt pavement on 17th Street was dry and forty feet in width at that point. There was a slight upgrade to the highway in the eastern approach to the crossing.

On the night in question, at about 3:25 a.m., a yard crew was engaged in switching and spotting industry cars. They were moving a train consisting of a diesel engine and three cars in a backward or "pushing" operation at a speed of some four mph, in a southerly direction along the Nogales branch line toward the point where its tracks intersect the street at approximately right angles. At this speed the evidence showed trainmen could jump on or off the train without it stopping. The engine with its headlight facing north was at the most northerly end of the train movement; the most southerly car was a boxcar. Two of defendants' employees—Hamilton, the brakeman, and Tipton, the foreman of the yard crew—were standing on top of the leading boxcar, stationed slightly forward of the middle thereof. Each had a lighted electric lantern in his hand and was facing in an easterly direction along 17th Street as the train approached the crossing. With this type of train movement the engineer was wholly dependent upon signals from these men. According to the positive testimony of the men atop the car, as well as the other members of the crew who testified, the bell on the engine was ringing as the train approached the crossing and the engineer had first sounded a standard crossing warning on the air horn some 200 feet before reaching the intersection. As the leading boxcar neared the crossing the men on top thereof saw from one-half to one block east of the tracks the automobile in which plaintiff was a passenger coming toward them. Both employees just had time to wave their electric lanterns "8 or 10 times", "violently", as stop signals to the oncoming car. When it became apparent to them that their signals were ineffective and the auto was not slowing down they signalled the engineer to stop the train, then crouched down and hung onto the top of the car. Immediately the engineeer applied the brakes and the train was stopped with the front end of the leading boxcar extending slightly over the center line of the roadway. The automobile crashed into the side of this boxcar at a point six to ten feet behind the front of it—near the front wheels of said car—with such force that it caused the boxcar to rock. The train traveled only some seven or eight feet after the impact before stopping. This railroad car was an old one of a dark russet color, and there were no lights of any kind affixed to it. Warehouse buildings 54 feet distant from the track in question and less than 20 feet north of East 17th Street obscured the vision somewhat and prevented the engineer from seeing traffic on the street coming from the east. This also prevented the driver of the west-

bound car from seeing the greater part of the train. The headlight from the engine was pointed in the opposite direction from the movement of the train, thus giving no visual warning of the approach of the box-car which was being shoved backward into the crossing.

Plaintiff was a guest passenger in a Buick automobile owned and operated by Verdell Reese, sitting in the front seat between the driver and the other passenger, William H. Reese, a brother of Verdell. The car had good brakes and lights and was otherwise in good mechanical condition. There is no contention that any of the occupants of the automobile were under the influence of intoxicants. While there was then no cross-arm sign or any other warning device of any kind on the east side of the railroad crossing, or on the north side of 17th Street, yet both the driver and plaintiff knew of the existence of the railroad crossing in question, having been over it once or twice before. There was a standard black and white R.R. crossarm 19 feet west of the track in the opposite or southwest corner of the crossing. No trainman was on foot flagging the crossing, and there were no stationary lights of any kind illuminating the crossing. All occupants of the car gave negative testimony that they heard no warning signals of either a ringing bell or air horn signifying an approaching train. No other automobiles were on the street at that early hour in the morning. As the Reese car approached the crossing, plaintiff and W. H. Reese were engaged in conversation, while the driver was looking straight ahead down the street upon which they were traveling. None of the occupants saw the electric lanterns being waved by the trainmen. Of the people in the car W. H. Reese was the first to see the moving train when their car was some fifty-five to sixty feet away from the R.R. tracks. We quote from his testimony as to what happened:

"Q. And what was the first thing you saw? A. Well, just a reflection from a wheel. I couldn't make out what it was when I first seen it.

"Q. What did you do when you first saw the reflection? A. I just tried to make out what it was. So when I did find out what it was I hollered 'Train.'

"Q. Did you see the outline of the boxcar itself? A. Sure, I did.

"Q. And then you hollered, 'Train'? A. Right.

"Q. Then, what happened? A. He jammed the brakes—ka-boom.

"Q. You weren't able to stop? A. No.

"Q. Now how much—tell me this, where was the boxcar, where were the wheels that you saw the reflection on when you first saw them? A. They was on the inside of the street when I first seen them.

"Q. You mean inside the curb lines of the street? A. That is right.

"Q. When you first saw this boxcar where was it? A. When I first saw the boxcar?

"Q. I mean, when you first made out the outline of the boxcar. A. It was coming in the street then.

"Q. Now, was it moving? A. Sure, it was moving.

"Q. In what direction? A. Going south."

Verdell Reese, the driver, stated that he was some forty or fifty feet back from the tracks when his brother hollered "train"; to that moment he had not seen the train and his brakes were immediately applied. We quote from his testimony:

"Q. Now, what was the first warning that you had that there might be an accident or collision? A. W. H. yelled, 'Train'.

"Q. And what did you do when he yelled? A. Jammed brakes.

"Q. What happened then? A. Then, just before the impact I could understand there was a boxcar and I never knowed nothing then but just the impact."

There is a sharp conflict in the evidence as to the speed of the automobile in which plaintiff was riding. The driver estimated his speed before the warning cry of his brother at 35 mph, the other occupants did not know how fast they were traveling but each testified that the driver was not driving fast enough for them to pay any attention to the speed. Members of the switching crew who were in a position to see the approaching car were unable to estimate its speed; however finally one of the men did testify that he thought it was traveling in excess of 40 or 45 mph. Patrolman Casey, who came onto the scene after the collision had occurred, testified the legal rate of speed at that point was 25 mph and from the measurements taken by him it appeared that the car had left a straight line skid mark back of point of impact for a distance of sixty-eight feet, four inches. He further stated that according to their tables and accepted formula a car being driven 40 mph could be completely stopped within that distance. However, from physical evidence before him he was of the opinion that the car must have been traveling 35 mph at the time it collided with the boxcar. The driver at the trial estimated the impact speed at five to ten mph and he stated that the south end of the boxcar had about reached the center of the street when he hit it. On cross-examination the driver was asked if he made any effort to swerve his car to the left to avoid a collision, and the answer was in effect that he did not because there was no time to do so. The driver of the car and his brother were not seriously hurt by the collision—just "knocked dizzy" or "bruised up a little and scared." Plaintiff admittedly sustained severe and permanent injuries to her legs and feet. She was hospitalized for 83 days. The verdicts are not being attacked as excessive in amount.

58

■ Defendants unwarrantedly place great reliance upon four cases decided by this court which set forth the extent of the duty of reasonable and adequate warning which a railroad company owes a motorist once a train is actually upon and blocking the crossing. These are Doty v. Southern Pac. Co., 59 Ariz. 449, 129 P.2d 991; Malin v. Southern Pac. Co., 62 Ariz. 126, 154 P.2d 790; Cope v. Southern Pac. Co., 66 Ariz. 197, 185 P.2d 772; Atchison, T. & S. F. Ry. Co. v. Renfroe, 77 Ariz. 28, 266 P.2d 745. Those cases stand for the proposition that once a train has occupied a highway crossing no duty arises for the railroad company to give any additional notice of the presence of the train upon the crossing, for the train itself is adequate warning to the approaching traveler. It is to be noted that this proposition is not applicable to the case here, for obviously this is not a "blocked crossing" situation. Simply enough, the train had not so occupied the crossing as itself to give adequate warning of its presence where, as here, the lead boxcar and the automobile reached the intersection at the same moment. This being so, the court was entirely correct in refusing to give certain of defendants' instructions which were premised upon the theory that it was dealing with a "blocked crossing" case.

■ We first consider the problem as to whether, as a matter of law, there was sufficient evidence of negligence upon defendants' part which was a direct and proximate cause of plaintiff's injury. The legal issues thus framed are whether there existed a duty on the part of defendants running to the plaintiff and whether the jury might have found a breach of that duty in the facts presented. Strictly speaking no question of the *existence* of a duty relationship between plaintiff and defendants is argued; but that a duty must exist between these parties is not disputed. It is axiomatic that a railroad company owes to travelers on the highway the affirmative duty of due care in the maintenance and safeguarding of its crossings and in the operation of its trains thereon. What constitutes such due care is measured in each instance by the facts of the particular situation. It is the *extent* of that duty for which defendants are chargeable which is here at issue.

■ Defendants argue that the performance of their duty is governed by both statutory and common law, and that measuring their action or nonaction as presented by the facts herein, by either standard they had done all which plaintiff might legally require. In other words, they contend reasonable men could not differ on the proposition that they had done all the situation required of them. The only statutory requirement involved here is that the train sound certain warning signals before crossing any public way. It is elementary that such a statute prescribes no more than a minimum code of conduct, failure to observe which is negligence as a matter of

law. Morenci Southern R. Co. v. Monsour, 21 Ariz. 148, 155, 185 P. 938. But merely by observing this statutory minimum defendants cannot escape the possibility that there may be negligence in their actions as measured by common law standards of due care. Grand Trunk R. Co. of Canada v. Ives, 144 U.S. 408, 12 S.Ct. 679, 684, 36 L.Ed. 485. In a proper situation one may be found negligent in not doing more than a statute requires of him. The common law standard of conduct applicable to a railroad company as to all persons in order to escape liability for injuries of another is to attain the status of a reasonably prudent person under the particular circumstances. Cf. Atchison, T. & S. F. Ry. Co. v. Renfroe, supra. In the instant case these "particular circumstances", under the often-repeated rule of viewing the facts most favorable to the prevailing party below, may be summarized as follows: defendant railroad company at three o'clock in the morning of a dark night, with the engineer's view of the street and the automobile driver's view of the train somewhat blocked by intervening buildings, backs a dark boxcar into an unlighted and unguarded grade crossing, giving as warning only the customary statutory signals for the operation of an *advancing* train together with the light of two lanterns held by men atop the boxcar. The only warning of the presence of the crossing itself is a crossarm signal across the street and on the opposite side of the tracks.

█ Under these peculiar facts we cannot, as a matter of law, say that the railroad company's action was reasonable or prudent. We hold the learned trial court was clearly correct in submitting the issues of negligence in the operation of the train over this crossing to the jury. Case v. Northern Pac. Terminal Co., 176 Or. 643, 160 P.2d 313; Morris' Adm'x v. Baltimore & O. R. Co., 107 W.Va. 97, 147 S.E. 547; Smith v. Southern R. Co., 207 S.C. 179, 35 S.E.2d 225.

█ Further attacking the denial of its motion for a directed verdict or for judgment n. o. v. the defendants advance the theory that negligent acts of the driver of the car, Verdell Reese, were the sole proximate cause of the collision. Candidly they admit:

"The question for determination by the court is whether or not under all of the evidence in the case reasonable men could escape the conclusion that the sole proximate cause of any injury suffered by the plaintiff was the negligence of Verdell Reese."

The law in this state relative to concurrent negligence of two separate parties has been fully summarized in Nichols v. City of Phoenix, 68 Ariz. 124, 134, 202 P.2d 201, 207. We approve of the law therein expressed, and deem it unnecessary to repeat it here in extenso. It is sufficient to say that on the basis of the facts of this case

the jury legally could well find that any negligence of Verdell Reese was not such a supervening force as to relegate the negligence of the railroad company to the status of a remote cause of plaintiff's injuries.

By far the greater number of defendants' assignments of error—predicated on the court's refusal to grant a new trial—are to the granting of certain of plaintiff's instructions and the refusal of many of their own. Several points of law are thereby raised, which we shall treat as required. In several instances the issues raised by these assignments may be grouped and treated together.

■■ Defendants complain of the giving of plaintiff's requested instruction number 3, which said in part:

"* * * The fact that the view of such travelers on the street may be blocked by buildings or other obstructions is a circumstance to be taken into consideration in determining the amount of care which the railroad must exercise at a particular crossing. * * *"

They contend there was no competent evidence of an obstructed view, that this instruction constituted a comment on the evidence, and was again prejudicial in view of the fact that the court refused to give defendants' requested instruction number 10, to the effect that "a railroad company cannot be blamed for structures and buildings" etc. which may have obstructed the view. In this respect we may note that defendants' instruction number 11, which was given, is a statement pertaining to the duty of a traveler when his view is obstructed. Defendants blow both hot and cold. On one hand they decry a lack of evidence upon the point of plaintiff's obstructed view, while on the other hand a proffered instruction on the very same point is given to the jury at their request. We hold that the evidence fully supports both of the given instructions. However, the instruction as to the "blame" for the presence of such obstructions was properly refused, as it was not material to the case. Plaintiff's instruction number 3 correctly stated the law, that such obstructions are circumstances to be taken into consideration, both by the railroad in operating its train over this crossing and by the jury in assessing the reasonableness of the railroad's actions.

Three of defendants' requested instructions which the court refused to give raised the question of the extent of the duty of the railroad over and above any requirements made by law for the public safety. Both the maintenance of crossings and operation of trains are subject to regulation by the Arizona Corporation Commission. Specifically by requested instructions numbered 23 and 23(a) defendants proposed the jury should be told that since there was no order, rule or regulation of the Commission requiring them "to install, use, maintain or operate any electrical or mechanical signal, human watchman, or other warning device" at the crossing, then there

is no legal duty on their part to maintain any such protection. Instruction number 7 further attempted to delineate the duty of the railroad company under the circumstances, as to the statutory requisites to be complied with by a train approaching a crossing and pointed out the absence of any statute requiring the railroad to maintain any lights on the rear end of a train which is backing up.

We hold these instructions were properly refused, in that they are not proper statements of the applicable law. The instructions purported to lay down the rule that in the absence of any public safety requirements, the failure of the company to guard the crossing or to use any warning lights on the end of the train was not, as a matter of law, negligence. To support this rule the defendants rely upon the case of Canion v. Southern Pac. Co., 52 Ariz. 245, 252, 80 P.2d 397, 401. Therein plaintiff attempted to establish negligence in the failure of the railroad to retain a watchman or automatic signal at the crossing in question. With no proof of an order or regulation requiring such warning devices, this court said:

"* * * unless there is affirmative evidence showing that reasonable care would require such warning to be maintained, we think it was not negligence for the railroad company to fail to maintain a watchman or automatic signal at the crossing. The proper authorities have the power, in case they think a crossing is particularly dangerous, to require special precaution to be taken by the railroad company at such crossing, but in the absence of a regulation to that effect, we think the failure of the company to guard a crossing in that manner is not, as a matter of law, negligence." (Emphasis supplied.)

Plaintiff cites the same decision, and further relies upon the case of Morenci Southern R. Co. v. Monsour, supra [21 Ariz. 148, 185 P. 940] wherein we said:

"The statutory signals at public crossings are not prescribed for the purpose or with the idea of relieving the railroad from using other means of warning where available or necessary. They are merely the minimum of duty to warn * * *." (Emphasis supplied.)

As we have noted above, the duty of the railroad must be measured by the standard of reasonable care under the circumstances. A statute or commission order requiring a railroad to erect suitable warning devices prescribes the minimum of care which must be observed, and does not furnish a standard by which to determine in every case whether the railroad has discharged its duty with respect to giving sufficient warning of the presence of the crossing and of the approach of trains. The reasonable need for crossing protection in addition to the warnings required

by statute is to be determined by the special and unusual dangers of the particular crossing. 74 C.J.S., Railroads, § 730; Annotation—Railroad Crossings—Safety Devices, 71 A.L.R. 369. Cf. Annotation—Highway Crossing Signals, 5 A.L.R.2d 112.

In Case v. Northern Pac. Terminal Co., supra, the rule is laid down that greater care must be exercised in the protection of the public during switching operations when trains are being backed than would be required if trains are moving forward. In Smith v. Southern R. Co., supra [207 S.C. 179, 35 S.E.2d 227], it is said:

"* * * It is uniformly recognized that the operation of a train backwards at night over a road crossing is attendant with a great amount of danger to travelers and consequently a railroad company is bound to exercise special care, when doing so, to avoid injuring persons lawfully on' or approaching the track. * * *"

Cf. 74 C.J.S., Railroads, § 733. We may add that this rule is particularly true when the train's approach is obscured by obstructions, as the evidence herein would indicate.

In this case there is affirmative evidence from which the jury could have found that reasonable care would require additional warning of this train's operations over the instant crossing. Even in the absence of a requirement of special precautions by the public authorities the jury could have found a situation of unusual and particular danger herein which could be the basis for a finding of negligence in the failure of defendants to maintain additional safeguards. The problem herein is not whether the railroad should have permanently maintained at this crossing a watchman or other automatic warning device but rather whether in view of the particular circumstances at the specific time of the collision it should have given some more adequate form of warning, the lack of which may be found to be a breach of its duty of due care. The inescapable conclusion is that these requested instructions were inapplicable to this case.

Defendants' next assignment of error is to the giving of plaintiff's instruction number 9, which described the burden of proof as to contributory negligence, then goes on to spell out the duty of a passenger in a car approaching a railroad crossing. Defendants also assign as error the refusal to give certain instructions of their own (numbers 32, 33 and 33–(a)) pertaining to the same subject. The legal problem thus raised is the extent of the duty of such a passenger approaching a railroad grade crossing to see to her own self-protection.

Both parties cite the case of Humphrey v. Atchison, T. & S. F. R. Co., 50 Ariz. 167, 173, 70 P.2d 319, 322. In that case we held that:

"* * * While a passenger in an automobile is not required to assume

the same responsibility for its operation as is the driver, he may not utterly disregard plain warnings of imminent danger, more apparent to him than to the driver, and fail to warn the latter."

The first question presented is whether defendants' instructions numbered 33 and 33a, which set forth the rule of the Humphrey case in haec verba, were properly refused. In that case the "plain warnings" were spelled out in the evidence. In the instant case no such warnings of imminent peril were "more apparent to Mrs. Mitchell than to the driver." The evidence is undisputed that plaintiff was engaged in conversation with W. H. Reese; she had ridden with Verdell Reese before, and nothing then or on the morning in question in his conduct or operation of the car had given her any cause to believe that he was other than a safe driver. We hold these two instructions were properly refused, since unsupported by any evidence.

The second question then is whether plaintiff's knowledge of the presence of the approaching tracks raised in her a duty to maintain a lookout—i. e., to "look and listen"—for the presence of trains at or upon the crossing. Upon this point the court adopted plaintiff's version (instruction number 9), to the effect that "the passenger is not obligated to warn the driver merely because he sees or knows of a railroad crossing * * * unless he knows that the driver is likely to be inattentive or careless." The court refused defendants' version (instruction number 32), which said in part:

"* * * It was as much the duty of the said plaintiff, Birdie Mitchell, to look and listen for an approaching train before permitting herself to be placed on such railroad track as it was of the driver of the automobile * * *."

We are cited to the case of Chicago, R. I. & P. R. Co. v. Cox, 10 Cir., 208 F.2d 871, in which the refusal to give substantially the same instruction was held reversible error. Despite such distinguished authority, we hold the above is not a proper statement of the law in this case. It is directly contradictory of our pronouncement in the Humphrey case, supra, in that it tells the jury that the passenger's responsibility when approaching a railroad crossing is the *same* as that of the driver; Humphrey says clearly that it is *not* the same. Furthermore it is contrary to the general rule as to the duty of a passenger in an automobile to take precautions for his own safety. Restatement of the Law—Torts, Sec. 495, espec. comment (c); cf. 75 C.J. S., Railroads, § 771 c.(2). Once having accepted the premise that the passenger's responsibility for the operation of the car is less than that of the driver's, then an instruction purporting to fix on both equal responsibilities is erroneous. We do not go so far as to say that no duty whatsoever devolved upon Mrs. Mitchell. Suffice it to say that under the facts of this case

her duty did not rise to the same level as that of the driver. We hold the trial court properly chose between these various proffered instructions.

 It would unduly extend this already long opinion to separately treat all of the other assignments of error. Each of them has been considered and found to be without merit. While we recognize that each side is entitled to appropriate instructions defining its rights, Pacific Finance Corp. of California v. Morrow, 76 Ariz. 207, 262 P.2d 247, we hold the remainder of defendants' requested instructions were properly refused since material parts of the instructions were either covered by other instructions, outside the issues of the case, or inapplicable to any evidence adduced at the trial.

 One of the grounds urged by defendants as a basis for a new trial was that there was misconduct on the part of the jury in receiving a communication from the bailiff and court reporter without authorization of the court and without the knowledge or consent of the parties. This they maintain constitutes reversible error. The occurrence giving rise to this complaint arose as follows: defendants asked that seven forms of verdict be submitted to the jury; plaintiff thought two were sufficient. The court chose to give three forms, i. e., one finding for the plaintiff on count one, another on count two, and one verdict finding the issues for defendants. The court endeavored in its charge to explain that if the jury found negligence in operation they should return a verdict on count one; if they found defendants guilty of negligence in maintenance of crossing they should return another verdict on count two; that if they found negligence under both counts they should return two verdicts for the plaintiff; that if they found negligence in neither they should return a verdict for the defendants. During its deliberations, the jury became confused as to which count was which, and requested the bailiff to get them the answer to the question. This officer was unable to contact the trial judge, so the bailiff and court reporter—both of whom were obviously new and inexperienced—went to the jury room, where the reporter read only that part of her shorthand notes in which the judge had instructed the jury as to these three forms of verdict. No other communication passed between either of the officials or jury. Manifestly this intrusion into the jury room was highly improper, being directly contrary to the provisions of Section 21–1023, A.C.A.1939, as well as violative of the oath just taken by the bailiff. Although in this instance it was apparently done with no ulterior purpose, nevertheless such conduct was clearly improper and is deserving of censure. The incident can only be accounted for through the lack of understanding on the part of both the members of the jury and the officials as to the impropriety of such action. The crucial question remains, were defendants prejudiced as a result thereof and did the trial court

abuse its discretion in refusing to grant defendants a new trial on account of this intrusion? Defendants take the position that this was too serious an infraction of fundamental safeguards to be condoned. Citing, Katz v. S. W. S. Building Corp., 161 Misc. 777, 293 N.Y.S. 287. Plaintiff does not attempt to uphold the propriety of what was done but maintains that the court's ruling denying motion for new trial does not constitute reversible error. Plaintiff invokes Rule 61, Rules Civil Proc. (now appearing as Sec. 21-1503, A.C.A.1939 under the head of harmless error), which reads in part:

"* * * The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties."

■ Plaintiff cites Lane v. Mathews, 74 Ariz. 201, 206, 245 P.2d 1025, wherein this court refused to reverse, after denial of motion for mistrial, where a jury had improperly obtained access to a dictionary to use in their deliberations. The problem is fully discussed in the excellent opinion of Ketchum v. Chicaga, St. P., M. & O. R. Co., 150 Wis. 211, 136 N.W. 634, 637. See also Annotation: Communication with jurors—Prejudice, 41 A.L.R.2d 288. Taking into consideration the nature of the improperly received material and the lack of any undue emphasis as to any phase of the law in the case, we cannot say as a matter of law that prejudice seems so affirmatively probable as to constitute an abuse of discretion for the trial court to have denied defendants' motion for new trial, though we in no wise condone the misconduct of the court officials leading to the infraction.

■ Finally the defendants assign as error the trial court's granting of plaintiff's motion to permit the amendment of the jury's verdict on count two to include amount of the damages found, it being defendants' contention that the amount thereof was not capable of being arithmetically calculated. We have heretofore explained the three forms of verdict submitted. The jury by signing both of plaintiff's verdicts in effect found for the plaintiff on both counts of the complaint, i. e., it found the railroad negligent in both the operation of the train and in the maintenance of the crossing. Manifestly it found plaintiff's damages at $35,000 for that was the amount inserted on the count one verdict. It left the amount blank on the verdict as to the second count, which omission was not discovered until after the jury had been discharged. Thereafter as a basis for her motion to amend the verdict by inserting the sum of $35,000 as to count two, plaintiff obtained the affidavit of all twelve members of the jury attesting to their intention to assess plaintiff's damages as to both counts in the *aggregate* sum of $35,-000. A hearing was had and the motion granted. On this state of the record we are of the opinion that the court had jurisdiction to grant the motion to amend or correct the verdict. See, Kjerschow v.

Daggs, 24 Ariz. 207, 207 P. 1089; Ward v. Johnson, 72 Ariz. 213, 232 P.2d 960.

"Generally, the court has the power to put a manifestly irregular or defective verdict in such form as to make it conform to the intention of the jury, and carry their findings into effect, where the intention can be ascertained with certainty." 89 C.J.S., Trial, § 515.

And while jurors will not be heard to impeach a verdict duly rendered by them, yet it is held:

"* * * affidavits of jurors are admissible to show that the verdict, as received and entered of record, by reason of a mistake does not embody the true finding of the jury * * * or to remove an ambiguity * * *." 89 C.J.S., Trial, § 523.

We hold the defendants were in no wise prejudiced by the court inserting $35,000 in the verdict as to count two, as this did not increase the amount of recovery but merely carried out the manifest intent of the jury.

This case was well and fairly tried and perceiving no reversible error in the record, the judgment is affirmed.

LA PRADE, C. J., and WINDES, PHELPS and STRUCKMEYER, JJ., concur.